Certiorari Denied, No. 31,903, November 23, 2009

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2010-NMCA-001**

**Filing Date:  June 30 , 2009**

**Docket No. 28,443**

**CHRIS L. WEST,**

 **Plaintiff-Appellant,**

**v.**

**WASHINGTON TRU SOLUTIONS, LLC,**

 **Defendant-Appellee.**

**APPEAL FROM THE DISTRICT COURT OF EDDY COUNTY**
**Charles C. Currier, District Judge**

Martin Law Firm
W.T. Martin, Jr.
Carlsbad, NM

for Appellant

Sheehan, Sheehan & Stelzner, P.A.
Jaime Dawes
Kim A. Griffith
Luis G. Stelzner
Albuquerque, NM

for Appellee

**OPINION**

**WECHSLER, Judge.**

**{1}** Chris West (Employee) appeals that portion of an order granting summary judgment in favor of Washington Tru Solutions, LLC (Employer) on Employee's claims of breach of an implied contract and breach of the implied covenant of good faith and fair dealing.  As

there are questions of material fact regarding the existence of an implied contract that Employee would not be terminated except for just cause and after the use of progressive disciplinary procedures, we reverse.

## BACKGROUND

**{2}** Employee was a long-time management-level employee of Employer. In June 2001, Employer decided to merge Employee's department with another department and replace Employee as manager of communications. Employee was reassigned to a position in another department. Although Employee received the same pay in his new position, he no longer had any employees to manage, and he perceived the move to have been a demotion. On August 23, 2002, Employer informed Employee that Employee would receive a salary for two more months while he looked for another job. Employer asserted that it took this action because there was not enough work for Employee in his new position.

**{3}** Employee sued Employer, bringing claims for breach of an implied contract of employment and for violation of the implied covenant of good faith and fair dealing, among other claims. Employee believed that he was not terminated because of inadequate job performance or as a cost-cutting measure, but instead because of interpersonal difficulties he had with a superior at work and a contractor who was a friend of the superior. The district court granted summary judgment in favor of Employer.

## STANDARD OF REVIEW

**{4}** Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Rule 1-056(C) NMRA. An issue of fact is genuine if the evidence before the district court would allow a reasonable factfinder to find in favor of the non-moving party on that issue of fact. *See Goradia v. Hahn Co.*, 111 N.M. 779, 782, 810 P.2d 798, 801 (1991). We review the district court's ruling on a motion for summary judgment de novo. *Tafoya v. Rael*, 2008-NMSC-057, ¶ 11, 145 N.M. 4, 193 P.3d 551. In doing so, we "construe all reasonable inferences from the record in favor of the party that opposed the motion." *Hamberg v. Sandia Corp.*, 2008-NMSC-015, ¶ 7, 143 N.M. 601, 179 P.3d 1209 (internal quotation marks and citation omitted).

## THE EXISTENCE OF AN IMPLIED CONTRACT

**{5}** Employee asserts that the district court erred in granting summary judgment in favor of Employer because genuine issues of material fact exist on the question of whether there was an implied contract that Employee would not be terminated except for cause and after Employee was afforded the benefit of certain disciplinary proceedings that would have given him a chance to correct any problem his employer may have had with him.

**General Principles**

**{6}** Employment is generally terminable at will, absent an express contract to the contrary. *Lopez v. Kline*, 1998-NMCA-016, ¶ 10, 124 N.M. 539, 953 P.2d 304 (filed 1997). There is an exception, however, when an employer creates an implied contract limiting its ability to terminate an employee at will, by either providing that termination will only be for cause or providing for certain procedural protections prior to termination. *See Mealand v. E. N.M. Med. Ctr.*, 2001-NMCA-089, ¶ 9, 131 N.M. 65, 33 P.3d 285. Such an implied contract is created when an employer's "words or conduct . . . support a reasonable expectation on the part of employees that they will be dismissed only in accordance with specified procedures or for specified reasons." *Id.* The factfinder must examine the totality of the circumstances of the employment relationship when considering whether an employer's words or conduct constituted an implied promise modifying the at-will relationship. *Lopez*, 1998-NMCA-016, ¶ 12. An implied promise may be found in written or oral representations, in the conduct of the parties, or in a combination of representations and conduct. *See Newberry v. Allied Stores, Inc.*, 108 N.M. 424, 427-28, 773 P.2d 1231, 1234-35 (1989).

**{7}** Whether an implied contract exists is generally a question of fact. *See Hartbarger v. Frank Paxton Co.*, 115 N.M. 665, 669, 857 P.2d 776, 780 (1993). Therefore, the issue ordinarily should not be decided on summary judgment. *Kiedrowski v. Citizens Bank*, 119 N.M. 572, 575, 893 P.2d 468, 471 (Ct. App. 1995). But, because an employee's expectation based on an employer's words or conduct must meet "a certain threshold of objectivity," *id.*, an employer may be entitled to judgment as a matter of law if the employee's expectations are not objectively reasonable. *See Mealand*, 2001-NMCA-089, ¶ 9. Therefore, the issue this Court must decide on review of the district court's order granting summary judgment is "whether, on the evidence before the [district] court, a reasonable jury could find that [Employer's] words and conduct support an objectively reasonable expectation that its employees will be dismissed only in accordance with specified procedures and for specified reasons." *Id.*

**Employee's Objectively Reasonable Belief in the Existence of an Implied Contract**

**{8}** Employee presented evidence that Employer promulgated an employee handbook (Handbook) and a manager's reference guide (Guide) that contained representations that could reasonably be construed to assure employees that they would be terminated only for cause and after the use of certain remedial disciplinary procedures. The Handbook states that Employer's "[p]ersonnel policies and procedures are specifically designed to meet the needs of employees" and that Employer "endeavor[s] to provide a positive environment where each employee enjoys . . . individual responsibility for career development." The Handbook includes a section on employee performance, which states that Employer seeks to create a "performance evaluation program [that] is as fair, efficient, and productive as possible," in order to "provide[] documentation in support of promotion and other personnel decisions," ensure that an employee's performance is linked to his pay, and "provide[] specific performance feedback, . . . enabling [the employee] to grow and develop" professionally. The Handbook also includes a section called the "Rules of Conduct and Progressive Discipline Process," which states that its rules "are provided for your general

3

information and to assure uniform and fair administration of disciplinary action if ever it is necessary." It states unequivocally, "[y]ou will be expected to abide by these rules." The Handbook then sets out three types of misconduct, with numerous detailed examples of each, and provides the consequences for such acts. The Handbook states that the list "is not an all-inclusive list" and that "[a]ny disciplinary action will, of course, be based on the facts and circumstances in each specific case[,] as well as the total record of the employee(s) involved."

**{9}** The Guide states that it is "intended to define managers' and employees' responsibilities within division policies, procedures and practices; provide a framework for decision making; and establish reasonable boundaries of behavior and authority." The Guide informs managers that an employee's "[g]ood performance, misconduct or poor performance should be recorded when it occurs and communicated to the employee immediately, regardless of when the formal, scheduled appraisal is given." With respect to deficient job performance, the Guide states that

> [i]f a manager finds an employee's overall performance unsatisfactory, the manager places the employee on a Performance Action Track. **At the time of this decision, the manager must contact Human Resources, and a specialist advisor will be assigned.**
>
> The Performance Action Track is from 2 months to 6 months in duration and ends with either fully satisfactory performance or application of progressive discipline, which may lead to termination.

The Guide also contains a section on Performance Improvement Plans. That section explains that a

> Performance Improvement Plan serves as a notice of need for improved performance. The Plan must include:
>
> • identification of performance deficiencies
> • clearly written expectations and goals that the employee must achieve for fully satisfactory performance
> • the period of time in which improved performance is expected
> • possible consequences if performance is not fully satisfactory at the end of the Plan period [and]
> • a schedule of planned, periodic meetings to document and assess progress[.]
>
> . . . .
>
> If an employee subject to a Performance Improvement Plan does not meet the required level of performance, the employee is issued a formal, final notice requiring immediate improved performance. This is considered the final step in progressive discipline prior to termination.

4

The Guide additionally contains steps for managers to use in coaching and counseling employees in order to improve performance.

**{10}** The Guide states that Employer's "own best interest lies in ensuring fair treatment of all employees and in making certain that disciplinary actions are prompt, uniform, and impartial. The major purpose of any disciplinary action is to correct the problem, prevent recurrence, and prepare the employee for satisfactory service in the future." The Guide provides that while there may be some extreme rule violations—such as "theft, assault on another employee, or a willful violation of a safety rule that could produce a life-threatening situation"—that might warrant immediate termination, "most rule violations, including poor or unacceptable work performance, are handled in accordance with the Process Guidelines outlined in this section. Managers and employees are expected to understand and implement this process."

**{11}** The Guide contains a section entitled "Wrongful Discharge." That section states that

> [s]ince most wrongful discharge claims are based on employees' contentions that they were arbitrarily or unjustly terminated, an organization's establishment of and adherence to a progressive discipline policy can protect an employer from such liability.

> While employment [with Employer] is <u>at will</u>, [Employer] applies processes within progressive discipline to provide for application of a test for just cause.

> . . . .

> *Although promising to use a just cause test might undermine the at-will nature of employment, some employers choose to apply the test in order to create a sense of fairness.*

The Guide then sets out several steps Employer uses in order to ensure that the requirement of just cause for termination is met. It states that "[a]ny proposed discipline beyond formal documented counseling must be reviewed by a higher level of management, in consultation with the Human Resources . . . Manager. The purpose of this review is to ensure that discipline is justified and uniformly applied." Although the Guide seeks to ensure uniformity, it indicates that "[m]anagers, with approval from the Human Resource Department, can modify application of the Process Guidelines to reflect mitigating or aggravating circumstances, the employee's length of service, or the employee's past record."

**{12}** Employee presented evidence that Employer trained its managers that they were expected to use the progressive disciplinary procedures outlined in the Handbook and the Guide and that employees could rely on progressive discipline being applied to them. Furthermore, Employee presented evidence that it was Employer's practice to discharge an employee only for cause and after first giving an employee the opportunity to remedy the problem through the progressive disciplinary process.

5

**{13}** Employer points out that there was also evidence in the record to suggest that a reasonable employee should not have relied on Employer's representations that employees would be terminated only for cause and after progressive discipline. The Handbook states:

> This guide is not a contract of employment or a guarantee of employment for any period of time, and nothing herein changes the at-will nature of your employment.
>
> . . . .
>
> No manager is authorized to create binding employment contracts on behalf of the company with any individual, whether orally or in writing, except through procedures as may be authorized by the Senior Executive Vice President of Human Resources.
>
> . . . .
>
> The policies, procedures, and programs outlined in this handbook are designed to serve as guidelines to keep you informed of relevant facts about your employment. They are not intended to create any kind of contractual relationship and are subject to change at [Employer's] discretion, with or without notice.
>
> . . . .
>
> [R]elease for unsatisfactory performance or violations of rules of conduct or for any reason can take place at times other than during [an employee's] initial review period.

**{14}** The Guide contains similar disclaimers:

> Managers and employees should understand that the guide does not modify the company's "at will" employment doctrine nor provide employees any kind of contractual rights. The guide does not form an expressed or implied contract or promise that the policies outlined will be applied in all cases. [Employer] may add, revoke, or modify policies at any time.

The Guide also states that "[a]lthough employment with [Employer] is based on mutual consent and both the employee and [Employer] have the right to terminate employment at will, with or without cause or advance notice, [Employer] may use progressive discipline at its discretion."

**{15}** Employer also points to certain statements Employee made during his deposition: Employee stated that no representative of Employer ever told him he could only be terminated for cause, he did not remember anything that any representative of Employer ever did that led him to believe that he could only be terminated for cause, and there was nothing

6

in writing that he received establishing that he could only be terminated for cause. Employee also stated that he believed that the use of progressive discipline was within a manager's discretion.

**{16}** In light of the conflicting evidence before the district court, we agree with Employee that a genuine issue of material fact exists as to whether Employer and Employee had an implied contract that Employer would only terminate Employee for cause and after certain disciplinary procedures were followed. Whether such an implied contract exists is based on the totality of the circumstances of the employment relationship between the parties, *see Lopez*, 1998-NMCA-016, ¶ 12, and a reasonable jury could conclude that the evidence of Employer's statements in the Handbook, the Guide, and the managers' training sessions, along with the evidence that Employer had a practice of only terminating for cause, reasonably led Employee to rely on Employer's words and conduct.

**{17}** While we recognize that Employer also made contrary representations in the Handbook and the Guide, such disclaimers are not dispositive. First, the Handbook and the Guide themselves contain specific policies regarding termination for just cause and the use of progressive discipline that an employee might reasonably conclude modify the at-will relationship, despite these disclaimers. *See, e.g.*, *Beggs v. City of Portales*, 2009-NMSC-023, ¶ 20, 146 N.M. 372, 210 P.3d 798 ("[E]ven where a personnel manual purports to disclaim any intentions of forming contractual obligations enforceable against an employer, a fact finder may still look to the totality of the parties' statements and actions, including the contents of [the] personnel manual, to determine whether contractual obligations were created."); *Kiedrowski*, 119 N.M. at 575, 893 P.2d at 471 ("[A]n implied contract can still exist in spite of a disclaimer, where the employer's conduct reasonably leads employees to believe that they will not be terminated without just cause and a fair procedure."); *cf. McGinnis v. Honeywell, Inc.*, 110 N.M. 1, 5-6, 791 P.2d 452, 456-57 (1990) (holding that a disclaimer in a supervisor's manual was not dispositive on the issue of whether the manual modified an express employment contract). Read together, the Handbook and the Guide provide that progressive disciplinary procedures apply both to poor job performance and to misconduct. Viewing this evidence in the light most favorable to Employee, a reasonable jury could find that because Employer established such extensive and specific policies and procedures for using progressive discipline to address both performance and misconduct, these representations indicated both that 1) employees would not be terminated for no reason at all, and 2) progressive disciplinary procedures would apply except in the most extreme cases. *See Mealand*, 2001-NMCA-089, ¶¶ 12-13 (stating that the use of specific examples in a handbook of business reasons for termination could lead an employee to reasonably infer that the employer "would not discipline or discharge an employee for a reason unrelated to a legitimate business need" and that "[a]n employee might reasonably believe that [the employer] would not have described the progressive discipline system in such detail, nor would it have disseminated the policy to employees, if the progressive discipline policy was simply a non-binding set of guidelines to be used in management's complete discretion").

**{18}** Second, even if an employee manual contains clear disclaimers, these may be superceded by other representations made by the employer outside of the manual—for

instance, in oral statements. *See Lopez*, 1998-NMCA-016, ¶¶ 9 n.1, 16. And, in this case, Employee presented evidence that Employer put on managers' training sessions at which Employer represented that termination was for cause and only after progressive discipline.

**{19}** Employer argues that summary judgment was appropriate because it is clear that the policies of termination for just cause and progressive discipline were discretionary with Employer. But the evidence on this issue was sufficiently conflicting to present an issue of fact for the jury to resolve. Although there was language in the Handbook and the Guide indicating that the use of progressive discipline was discretionary, there was also language indicating that managers and employees "must" or were "expected to" use the outlined procedures. Furthermore, because the disciplinary procedures contained statements that there were some infractions that would lead to immediate termination and statements that managers had discretion to take into account an employee's work history when determining how to discipline the employee, a reasonable jury might conclude that this was the sort of discretion that Employer could reasonably be expected to use—not total discretion to fire employees without reason or warning. To the degree that Employer drafted the Handbook and the Guide to contain internal contradictions, it is for the jury to determine how a reasonable employee would have understood the language in the documents. The fact that there was some evidence indicating that use of the procedures was discretionary does not require a determination as a matter of law that there was no implied contract. *See Hudson v. Vill. Inn Pancake House of Albuquerque, Inc.*, 2001-NMCA-104, ¶¶ 8-18, 23, 131 N.M. 308, 35 P.3d 313 (affirming the finding of an implied contract only to discharge for cause and after specific warnings and an opportunity to correct deficient performance even though there was conflicting evidence about whether the use of warnings was mandatory or discretionary).

**{20}** Finally, we note that this Court recently concluded that Employer made no representations in an employee handbook and in certain training sessions that would create a question of material fact as to whether a different employee had an implied contract that she would only be terminated for cause. *See Zarr v. Washington Tru Solutions, LLC*, 2009-NMCA-050, ¶¶ 17-23, 146 N.M. 274, 208 P.3d 919. Employer has not argued that *Zarr* controls this case, and we conclude that it does not. It does not appear that the plaintiff in *Zarr* relied on the Guide as part of her evidence of an implied contract, and we believe that the Guide contains significant representations—both as to the fact that progressive discipline applies, not only to incidents of misconduct but also to cases of poor job performance, and as to the fact that Employer uses a just cause standard for termination—that help to create genuine issues of material fact in this case. The difference between the outcome here and in *Zarr* highlights just how fact-dependent our inquiry must be when a claim of breach of an implied contract is raised. In this case, the evidence Employee presented to the district court demonstrated a genuine issue of material fact as to whether Employer's words and conduct would lead a reasonable employee to believe that Employer was bound by an implied contract.

**Employee's Subjective Belief that Employer Would Not Fire Him Except for Cause and After the Application of Progressive Discipline**

8

**{21}** Employer asserts that summary judgment is appropriate because Employee made statements in his deposition that could be construed to mean that he had no subjective expectation that he would only be terminated for cause and after progressive discipline. However, there is ample evidence in the record that, when viewed in the light most favorable to Employee, indicates that Employee did in fact have such a subjective expectation. Although Employee said at one point in his deposition that progressive discipline was discretionary with each manager, just moments earlier, Employee also testified that in the managers' training he received, progressive discipline was presented as what was expected of him and was not optional. It should be left to a jury to sort out any potential conflict in these statements.

**{22}** Employee also repeatedly stated in his deposition that he subjectively expected progressive discipline to apply to him. In response to a question about whether he understood that his employment was at will, Employee said:

> In a sense. But I believe, and I'm not sure if it's in this same document or the manager handbook or maybe both, there are also built-in steps when an employee is deficient or has a disciplinary problem that you go through those steps to correct whatever the deficiency is. And in my mind, that's what would lead to the at will. I don't think the company was into discharging people willy-nilly for no reason at all.
>
> . . . .
>
> And I had every reason to believe that had there been something wrong with my performance, that I would have been placed in one of the programs spelled out in these documents, that there is a series of steps that a manager and an employee would go through to improve whatever the deficiency was . . . . And, logically, at the end of that process, if I still hadn't cut the mustard, then the at will might kick in. But otherwise why are those things in those documents?

When asked what Employee understood "at will" to mean, Employee responded:

> I think it means you can discharge somebody for any reason . . . [o]r for no reason. But I also maintain that the company wasn't into doing that to people. The doctrine of the company was and always has been, as far as I'm concerned, and it's written into some of these documents, that we treat our employees with dignity and respect, and that doesn't mean shoving them out the door for no reason.

When asked about whether he understood the disclaimer that the Handbook does not create a contract, Employee said, "[b]ut if there is not an implied contractual relationship, why even bother to put the corrective steps in this document? I mean, it's contradictory." To the degree that Employee's deposition testimony reflected a degree of subjective confusion about the relationship between representations by Employer that employment was at will and

other representations by Employer that employment would only be terminated for just cause and after disciplinary proceedings, the confusion was created by the potentially contradictory nature of Employer's own statements. It is not appropriate on summary judgment to single out those portions of Employee's deposition that acknowledge that no representative of Employer ever expressly stated that employment was not at will or that progressive discipline would be applied in all cases and ignore those portions of Employee's deposition that, when viewed in the light most favorable to Employee, reasonably state that Employee subjectively expected that he would be fired only for cause and after progressive discipline. Accordingly, there is a genuine issue of material fact as to the nature of Employee's subjective expectations.

**Employer's Representations Regarding Progressive Discipline**

**{23}**    Finally, we note our disagreement with Employer's suggestion that Employer's representations about progressive discipline are not relevant to the issues on appeal. Employer suggests that because Employer claims that Employee was not fired either due to misconduct or poor job performance, but instead was fired for some other reason or no reason at all, Employer's representations about progressive discipline would not control its conduct in this case, even if there were an implied contract to apply progressive discipline in cases of poor work performance or misconduct. Assuming that the representations in the Handbook and the Guide create an implied contract to follow those procedures in cases of misconduct and poor performance, we cannot say that, as a matter of law, those representations are irrelevant to the question of whether the implied agreement between Employer and Employee left Employer free to terminate employees simply because a superior did not like them or for some other non-business-related reason. A reasonable jury could conclude that such an interpretation of the Handbook and the Guide would be unreasonable and would render the disciplinary procedures contained within them meaningless since Employer could then always fire an employee for an arbitrary reason in order to avoid having to follow the procedures. Because Employer promulgated such a comprehensive and specific set of procedures for handling almost all types of work-related problems and made a number of statements to suggest that these policies were put into place in order to create a sense of fairness, a jury could conclude that a reasonable employee might understand that these representations were intended to inform employees that they would not be terminated arbitrarily, for no reason, or for reasons that cannot be justified by reference to legitimate business interests. *See Mealand*, 2001-NMCA-089, ¶¶ 12-13. Therefore, Employer's representations about the use of progressive discipline are relevant even when Employer terminates an employee for reasons it asserts are unrelated to performance or misconduct.

**{24}**    Employer cites to statements by the district court during the hearing to support its argument that progressive discipline is irrelevant. However, the district court appeared to rely more heavily on the Handbook than on the Guide or other evidence for its conclusion that Employer's policies regarding progressive discipline were not relevant. But the district court was required to look at the totality of the circumstances of the employment relationship, and Employer's representations in the Guide and in management training sessions were part of the totality of the circumstances. Accordingly, it was error to view the

Handbook as the document that primarily defined the employment relationship.

**EMPLOYER'S BREACH OF ANY IMPLIED CONTRACT**

**{25}**    Employee asserts that there is a genuine issue of material fact regarding whether Employer's stated reasons for firing Employee were pretextual.  This argument raises the issue of whether any implied contract between the parties was breached by Employer's alleged conduct of firing Employee without cause and/or without the required disciplinary procedures and concealing the true nature of its action by asserting that Employee was fired for legitimate business reasons.  Employer does not dispute that there are material questions of fact on this issue; instead, Employer simply points out that this issue is not relevant to the question of whether the parties were bound by an implied contract.  Because we reverse the district court's grant of summary judgment, the parties will have the opportunity on remand to present evidence to the jury on this issue of whether any implied contract was breached.

**RELATIONSHIP BETWEEN AT-WILL EMPLOYMENT AND AN IMPLIED EMPLOYMENT CONTRACT**

**{26}**    Without directing this Court to any particular portion of the recording of the summary judgment hearing, Employee asserts that the district court's summary judgment order was based in part on its flawed conclusion that an employer-employee relationship could be both at will and controlled by an implied contract.  We need not address this argument as we have reversed the district court's ruling.  However, in order to clarify the matter for the parties on remand, we note that to the degree that there was an implied contract between the parties, it only covered those matters for which there were representations that were sufficiently specific for a reasonable employee to rely upon.  *See, e.g.*, *Lopez*, 1998-NMCA-016, ¶ 16 (holding that where an employer made representations that a reasonable jury might conclude constituted an implied contract not to terminate an employee due to her illness, the implied contract was limited to termination for illness, and not for any other cause).

**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

**{27}**    Employee argues that the district court erred in granting summary judgment on Employee's claim that Employer breached an implied covenant of good faith and fair dealing.  Both Employee and Employer agree that the basis of the district court's ruling was that there could be no implied covenant of good faith and fair dealing when the employment relationship was at will.  Because we have concluded that there is a question of fact as to whether the relationship was at will or whether it was governed by an implied contract, we reverse the district court's order dismissing Employee's claim based on a breach of the implied covenant of good faith and fair dealing.

**CONCLUSION**

**{28}**    There are questions of material fact as to whether there was an implied contract that Employee would only be fired for cause and after the application of progressive disciplinary

procedures.  Therefore, we reverse the district court's order granting summary judgment in favor of Employer on Employee's claims of breach of an implied contract and breach of the implied covenant of good faith and fair dealing.  We remand for a trial on the merits of these claims.

**{29}  IT IS SO ORDERED.**

 

_____
**JAMES J. WECHSLER, Judge**

**WE CONCUR:**

_____
**MICHAEL E. VIGIL, Judge**


_____
**ROBERT E. ROBLES, Judge**


**Topic Index for _West v. Washington Tru Solutions_, No. 28,443**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-RM | Remand |
| | |
| **CN** | **CONTRACTS** |
| CN-IC | Implied Contract |
| | |
| **CP** | **CIVIL PROCEDURE** |
| CP-SJ | Summary Judgment |
| | |
| **EL** | **EMPLOYMENT LAW** |
| EL-DA | Disciplinary Action |
| EL-EP | Employer's Policies |
| EL-EE | Employer-Employee Relationship |
| EL-EA | Employment at Will |
| EL-EC | Employment Contract |
| EL-TE | Termination of Employment |