# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number: 2010-NMSC-035**

**Filing Date: June 25, 2010**

**Docket No. 31,433**

**BEATRICE C. ROMERO and MICHAEL FERREE,**
**on behalf of themselves and all others similarly situated**,

      **Plaintiffs-Respondents,**

**v.**

**PHILIP MORRIS INCORPORATED, R.J. REYNOLDS**
**TOBACCO COMPANY, BROWN & WILLIAMSON TOBACCO**
**CORPORATION**,

      **Defendants-Petitioners.**

**ORIGINAL PROCEEDING ON CERTIORARI**
**James A. Hall, District Judge**

Montgomery & Andrews, P.A.
Sarah M. Singleton
Walter J. Melendres
Victor R. Ortega
Santa Fe, NM

Arnold & Porter, L.L.P.
Kenneth L. Chernof
Washington, DC

Boies, Schiller & Flexner, L.L.P.
David Boies
Armonk, NY

Jack G. Stern
New York, NY

Amy J. Mauser
Washington, DC

for Petitioner Philip Morris Incorporated

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Andrew G. Schultz
Albuquerque, NM

Jones Day
Edwin L. Fountain
Washington, DC

Thomas Demitrack
Cleveland, OH

for Petitioners R.J. Reynolds Tobacco Company
and Brown & Williamson Tobacco Corporation

Youtz & Valdez, P.C.
Shane C. Youtz
Albuquerque, NM

Ball & Scott Law Offices
Gordon Ball
Knoxville, TN

Cuneo Gilbert & Laduca, L.L.P.
Jonathan W. Cuneo
Daniel Cohen
Washington, DC

Hausfeld, L.L.P.
Michael D. Hausfeld
Megan E. Jones
Washington, DC

for Respondents

## OPINION

**CHÁVEZ, Justice.**

**{1}** In this class action lawsuit, Plaintiffs allege that Defendants engaged in an agreement to fix the price of cigarettes from 1993 to 2000. The district court granted summary judgment in favor of Defendants, because although Plaintiffs offered evidence of parallel pricing, they failed to establish a genuine issue of material fact regarding whether any

evidence, in addition to the parallel pricing, tended to exclude independent conduct on Defendants' part, as required by federal substantive law. On appeal, the Court of Appeals rejected the federal "plus factor" approach, and instead held that Plaintiffs could prove a conspiracy by parallel conduct alone, as long as independent conduct was an implausible explanation. *Romero v. Philip Morris, Inc.*, 2009-NMCA-022, ¶¶ 24, 44, 145 N.M. 658, 203 P.3d 873. The Court of Appeals also concluded that when looking at the evidence in the light most favorable to Plaintiffs, a genuine issue of material fact existed, therefore precluding summary judgment. *Id.* ¶¶ 43-44. *Romero v. Philip Morris Inc.*, 2009-NMCERT-002, 145 N.M. 704, 204 P.3d 29.

**{2}** We granted Defendants' petition for writ of certiorari to consider two issues. First, we consider whether the Court of Appeals applied the incorrect standard for summary judgment. Second, we consider whether the Court of Appeals correctly applied federal substantive law regarding alleged agreements to fix prices. Although we agree with the summary judgment standard applied by the Court of Appeals, we hold that the Court of Appeals did not correctly apply federal substantive law as required by NMSA 1978, Section 57-1-15 (1979). Under federal substantive antitrust law, 15 U.S.C. § 1 (2006), evidence of parallel price increases alone is not sufficient in the context of an oligopoly to prove an agreement to fix prices. Such evidence is always ambiguous, and therefore plaintiffs who allege a price-fixing agreement must also provide evidence that tends to exclude the possibility that parallel price increases were the result of independent conduct. Because federal law limits the inferences available to a jury to those that are reasonable, plaintiffs relying upon circumstantial evidence cannot survive summary judgment, as a matter of law, unless the evidence tends to exclude the possibility that the alleged conspirators acted independently. Independent conduct is also referred to in case law as "conscious parallelism," "tacit collusion," or "legal independent conduct." We therefore affirm the district court's grant of summary judgment and reverse the Court of Appeals.

**BACKGROUND**

**{3}** The following facts are undisputed. Plaintiffs are "[p]ersons in the State of New Mexico . . . who purchased cigarettes indirectly from Defendants, or any parent, subsidiary or affiliate thereof, at any time from November 1, 1993 to the date of the filing of this action [April 10, 2000]." The original Defendants were Philip Morris, R.J. Reynolds ("RJR"), Brown & Williamson ("B&W"), Lorillard, and Liggett. The events leading up to this lawsuit were set in motion in response to a Philip Morris strategy beginning with an event known as "Marlboro Friday."[1] Prior to Marlboro Friday, Philip Morris, the market leader, had been steadily losing market share to discount and deep discount cigarettes since 1980, when Liggett pioneered the development of generic cigarettes. *See Brooke Group Ltd. v.*

---

[1]We adopt the Court of Appeals recitation of the facts of the pre-Marlboro Friday events. *See Romero v. Philip Morris, Inc.*, 2009-NMCA-022, ¶¶ 4-10, 145 N.M. 658, 203 P.3d 873.

*Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 212 (1993). In an attempt to regain market share, Philip Morris announced Marlboro Friday on April 2, 1993, "a nationwide promotion on Marlboro that reduced prices at retail by approximately 20 percent, an average of 40¢ per pack." In response, RJR and B&W instituted similar promotions. As part of its strategy, Philip Morris announced on July 20, 1993, that there would be a similar reduction on all premium brands, discount brands, and deep discount brands starting on August 9, 1993. Defendants RJR and B&W also followed these price reductions. After these decreases, Defendants began to increase their wholesale list prices on premium and discount cigarettes in near lock-step fashion. Some increases were due to settlements with the 50 states, some because of increases in federal excise taxes, and others were simply planned. Even with these increases, wholesale list prices did not exceed pre-Marlboro Friday levels until August 3, 1998, or when adjusted for inflation, ongoing settlement costs, and federal excise taxes, the list prices did not surpass pre-Marlboro Friday amounts until August 1999. During the time period of the alleged agreement to fix prices, 1993 to 2000, Defendants were engaged in competition with one another regarding promotions at the retail level, resulting in a direct reduction of the retail prices of cigarettes.

{4}     Plaintiffs filed this class action lawsuit on April 10, 2000, alleging violations of New Mexico antitrust and consumer protection laws. *See* NMSA 1978, §§ 57-1-1 to -15 (1979, as amended through 1987); NMSA 1978, §§ 57-12-1 to -22 (1967, as amended through 1999). Defendants filed motions for summary judgment. In granting the motion for summary judgment, the district court held that Plaintiffs had met their initial burden of showing a pattern of parallel behavior, but failed to meet their second burden of showing the existence of plus factors that would tend to exclude the possibility that the alleged conspirators acted independently. Plaintiffs argued that the following were plus factors that tended to exclude Defendants' independent conduct: (1) the economics of the marketplace; (2) Defendants' strong motivation to conspire; (3) the fact that Defendants condensed the price tiers to facilitate their conspiracy; (4) Defendants acted contrary to their own self-interests; (5) alleged conspiratorial meetings in foreign markets; (6) Defendants had engaged in past conspiracies, such as misrepresenting the health consequences of smoking; (7) Defendants monitored their conspiracy through monthly factory shipment data reports prepared by Management Science Associates ("MSA"); (8) opportunities to conspire, including inter-firm communications and meetings; and (9) pricing decisions were made by those in high-level positions. However, the district court relied on the Eleventh Circuit case of *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1300 (11th Cir. 2003), to reject Plaintiffs' plus factors. The district court also held that even with the presentation of plus factors, "there still exists the opportunity for the defendant[s] to rebut the inference of collusion by presenting evidence establishing that no reasonable fact-finder could conclude that they entered into a price-fixing conspiracy." Plaintiffs appealed.

{5}     On appeal, the Court of Appeals acknowledged that "Marlboro Friday and the industry-wide price reductions that occurred afterward represented the triumph of competition over oligopolistic price coordination." *Romero*, 2009-NMCA-022, ¶ 27; *see also id.* ¶ 44. Although the Court affirmed summary judgment in favor of Lorillard and

Liggett because the evidence showed that they had merely acted "consistent with conscious parallelism," *id.* ¶ 46, the Court reversed summary judgment in favor of Philip Morris, RJR, and B&W because "[a]pplying *Brooke Group*, and relying on the opinions of Plaintiffs' expert, Dr. [Keith] Leffler, we think that a reasonable factfinder could view conscious parallelism as a relatively implausible explanation for the anticompetitive scenario that played out following Marlboro Friday," *Romero*, 2009-NMCA-022, ¶ 44. The Court acknowledged that New Mexico follows "federal case law interpreting Section 1 of the Sherman Act for substantive rules defining the scope of liability under [the New Mexico Antitrust Act] NMAA Section 1." *Id.* ¶ 18. It held that "behavior of market participants characterizable as mere conscious parallelism does not satisfy the conspiracy element requirement of NMAA Section 1," *id.* ¶ 22, and noted that federal courts have recognized the "doctrine of conscious parallelism as a substantive principle of antitrust law," *id.* ¶ 23. The Court also noted that federal law requires plaintiffs to present evidence of "plus factors" that tend to exclude the possibility of independent conduct. *Id.* ¶¶ 23-24. However, it did not follow federal precedent regarding plus factors, but held that "the sounder approach for a New Mexico court is to engage in an independent and rigorous evaluation of the evidence in deciding whether or not the plaintiffs' evidence tends to suggest a degree of coordination that *exceeds* the parallelism that could be accomplished through lawful conscious parallelism." *Id.* ¶ 24 (emphasis added). In addition, the Court held that "[t]he non-existence of conscious parallelism is not a separate element of the plaintiff's case." *Id.* ¶ 25.

> If the plaintiff comes forward with evidence that would allow a reasonable factfinder to exclude lawful conscious parallelism as the most likely explanation for the parallelism proved by the plaintiff, then the plaintiff has made out a prima facie case that would defeat summary judgment. At trial, then, the burden of negating the exculpatory inference of lawful conscious parallelism simply merges into the plaintiff's ultimate burden of convincing the factfinder that the parallelism proved by the plaintiff was more likely than not the result of a conspiracy.

*Id.* The Court of Appeals then constructed a hypothetical situation in which the jury could find that Defendants entered into an agreement to fix prices. *Id.* ¶¶ 27-30. Although rejecting the concept of plus factors, the Court held that

> [t]estimony by a qualified economics expert that the character or degree of parallelism actually exhibited by prices exceeds the parallelism that economic theory predicts would result from independent competitive behavior is precisely the type of evidence that tends to exclude the possibility that the defendants acted independently . . . [and] constitutes an extremely forceful "plus factor" . . . .

*Id.* ¶ 32. The Court also held that "Dr. Leffler's testimony is sufficient to meet Plaintiffs' burden of production," *id.*, and that "conscious parallelism in a complex, multi-variable industry is 'improbable,'" *id.* ¶ 35 (citation omitted). In its conclusion, the Court of Appeals

5

noted numerous ways in which the parallelism cited by Plaintiffs could not reasonably have been the result of Defendants' independent conduct. *Id.* ¶¶ 44-45.

**{6}** As stated previously, we granted certiorari to determine whether the Court misapplied the summary judgment standard and whether the Court failed to follow substantive federal antitrust law. We reverse the Court of Appeals and affirm the district court's grant of summary judgment.

## SUMMARY JUDGMENT

**{7}** Defendants argue that the Court of Appeals applied the incorrect summary judgment standard by referring to the "traditional stringent standard that a movant must meet." *Id.* ¶ 15. The standard, as articulated by the Court of Appeals, is to "view the facts in a light most favorable to the party opposing summary judgment and draw all reasonable inferences in support of a trial on the merits." *Id.* ¶ 17 (internal quotation marks and citation omitted). This was a correct statement of the standard for summary judgment in New Mexico:

> Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Where reasonable minds will not differ as to an issue of material fact, the court may properly grant summary judgment. All reasonable inferences are construed in favor of the non-moving party.

*Montgomery v. Lomos Altos, Inc.*, 2007-NMSC-002, ¶ 16, 141 N.M. 21, 150 P.3d 971 (filed 2006) (internal quotation marks and citations omitted). "Summary judgment is reviewed on appeal de novo." *Juneau v. Intel Corp.*, 2006-NMSC-002, ¶ 8, 139 N.M. 12, 127 P.3d 548 (filed 2005).

**{8}** New Mexico courts, unlike federal courts, view summary judgment with disfavor, preferring a trial on the merits. *Compare Handmaker v. Henney*, 1999-NMSC-043, ¶ 21, 128 N.M. 328, 992 P.2d 879 (noting that "the policy in New Mexico disfavor[s] summary judgment"), *and Pharmaseal Labs., Inc. v. Goffe*, 90 N.M. 753, 756, 568 P.2d 589, 592 (1977) ("Summary judgment is a drastic remedy to be used with great caution."), *with Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) ("Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole . . . ."), *and* 11 James William Moore, *Moore's Federal Practice* § 56.03[1] (3d ed. 2007) (discussing the trend in the federal courts to use summary judgment as a means of case management and resolution). Federal courts, on the other hand, following the "*Celotex* trilogy,"[2] have become more inclined to grant summary judgment and

_____

[2]*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

"substantially increased the availability of summary judgment and encouraged greater use of the motion by trial courts." 11 Moore, *supra* § 56.03[1], at 56-23. The *Celotex* trilogy favored greater use of summary judgment and "gave strong rhetorical support to summary judgment as a means of case management and resolution." 11 Moore, *supra* § 56.03[1], at 56-23; *see also* § 56.03[2][c], at 56-28 (noting that *Matsushita* abrogated "big case" and "defendant motive and state of mind" exceptions to summary judgment and allowing summary judgment where it traditionally had not been allowed (internal quotation marks omitted)); § 56.03[3], at 56-30 (noting that *Anderson* requires the courts to consider the substantive evidentiary burden at the summary judgment stage, thus creating a heightened evidentiary burden for those opposing summary judgment); § 56.03[5], at 56-36 (noting that *Celotex* held that movant for summary judgment could meet burden by demonstrating absence of support for essential element of claim and not just affidavits).

**{9}** We continue to refuse to loosen the reins of summary judgment, as doing so would "turn what is a summary proceeding into a full-blown paper trial on the merits." *Bartlett v. Mirabal*, 2000-NMCA-036, ¶ 32, 128 N.M. 830, 999 P.2d 1062 (internal quotation marks and citation omitted). We do not wish to grant trial courts greater authority to grant summary judgment than has been traditionally available in New Mexico. *See id.* ¶¶ 37-38. "Permitting trial courts a license to quantify or analyze the evidence in a given case under whatever standard may apply . . . would adversely impact our jury system and infringe on the jury's function as the trier of fact and the true arbiter of the credibility of witnesses." *Id.* ¶ 38. By our refusal to align our state's approach with that of the federal courts, we do not intend to imply that summary judgment is never appropriate.

**{10}** In New Mexico, summary judgment may be proper when the moving party has met its initial burden of establishing a prima facie case for summary judgment. *See Roth v. Thompson*, 113 N.M. 331, 334-35, 825 P.2d 1241, 1244-45 (1992). "By a prima facie showing is meant such evidence as is sufficient in law to raise a presumption of fact or establish the fact in question unless rebutted." *Goodman v. Brock*, 83 N.M. 789, 792-93, 498 P.2d 676, 679-80 (1972) (citations omitted). Once this prima facie showing has been made, the burden shifts to the non-movant "to demonstrate the existence of specific evidentiary facts which would require trial on the merits." *Roth*, 113 N.M. at 335, 825 P.2d at 1245. "A party may not simply argue that such [evidentiary] facts might exist, nor may it rest upon the allegations of the complaint." *See Dow v. Chilili Coop. Ass'n*, 105 N.M. 52, 55, 728 P.2d 462, 465 (1986). Rather, "[t]he party opposing the summary judgment motion must adduce evidence to justify a trial on the issues." *Clough v. Adventist Health Sys., Inc.*, 108 N.M. 801, 803, 780 P.2d 627, 629 (1989) (citation omitted). Such evidence adduced must result in reasonable inferences. *See Montgomery*, 2007-NMSC-002, ¶ 16. "An inference is not a supposition or a conjecture, but is a logical deduction from facts proved and guess work is not a substitute therefor." *Stambaugh v. Hayes*, 44 N.M. 443, 451, 103 P.2d 640, 645 (1940) (citation omitted). When disputed facts do not support reasonable inferences, they cannot serve as a basis for denying summary judgment. Only when the inferences are reasonable is summary judgment inappropriate.

**{11}**   In addition to requiring reasonable inferences, New Mexico law requires that the alleged facts at issue be material to survive summary judgment.  To determine which facts are material, the court must "look to the substantive law governing the dispute," *Farmington Police Officers Ass'n v. City of Farmington*, 2006-NMCA-077, ¶ 17, 139 N.M. 750, 137 P.3d 1204.  The inquiry's focus should be on whether, under substantive law, the fact is "necessary to give rise to a claim." *Eoff v. Forrest*, 109 N.M. 695, 702, 789 P.2d 1262, 1269 (1990); *see also Martin v. Franklin Capital Corp.*, 2008-NMCA-152, ¶ 6, 145 N.M. 179, 195 P.3d 24 ("An issue of fact is 'material' if the existence (or non-existence) of the fact is of consequence under the substantive rules of law governing the parties' dispute."); *Parker v. E.I. Du Pont de Nemours & Co.*, 121 N.M. 120, 124, 909 P.2d 1, 5 (Ct. App. 1995) ("A fact is material for the purpose of determining whether a motion for summary judgment is meritorious if it will affect the outcome of the case.").  In this case, substantive federal antitrust law is the filter through which we must determine whether genuine issues of material fact exist.  *See* § 57-1-15.

**FEDERAL SUBSTANTIVE ANTITRUST LAW:  PROVING THE CONSPIRACY**

**{12}**   As substantive law is the filter through which we apply summary judgment, and to construe our law in harmony with federal law, *see* § 57-1-15, we must first undertake an analysis of substantive federal antitrust law.  To establish a violation of Section 1 of the Sherman Act, a plaintiff "must be able to show:  (1) concerted action, (2) by two or more persons, (3) which unreasonably restrains interstate or foreign trade or commerce." *In re Med. X-ray Film Antitrust Litig.*, 946 F. Supp. 209, 215 (E.D.N.Y. 1996); *see also* 15 U.S.C. § 1.  It is important to note that Section 1 is not violated when the alleged conspirators act independently.  *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984) ("Independent action is not proscribed.").

> The essence of a Section 1 claim is the existence of an agreement. Unilateral action simply does not support liability; there must be a unity of purpose or a common design and understanding or a meeting of the minds in an unlawful agreement.  Concerted action is established where two or more distinct entities have agreed to take action against the plaintiff.

*Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005) (internal quotation marks and citations omitted).  Contrary to most markets, it is not always obvious whether firms in an oligopoly have acted independently.  *See In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 420 n.24 (S.D.N.Y. 2005) (defining oligopoly as "control or domination of a market by a few large sellers, creating high prices and low output similar to those found in a monopoly" (internal quotation marks and citation omitted)).  "[F]irms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions." *Brooke Group Ltd.,* 509 U.S. at 227.

> [A]n oligopolist's price and output decisions will have a noticeable impact on the market and on its rivals. . . . [For example,] in a market served by three large companies, each firm must know that if it reduces its price and increases its sales at the expense of its rivals, they will notice the sales loss, identify the cause, and probably respond. . . . Because of their mutual awareness, oligopolists' decisions may be interdependent although arrived at independently.

VI Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1429a (2d ed. 2003). To summarize, where there are very few sellers (firms) within a market, the actions of one seller will have a noticeable effect on the actions taken by the other sellers. The other sellers may perform a cost-benefit analysis and react to the actions of the leader, producing results similar to an unlawful price-fixing agreement, but actually resulting from lawful, independent action. This "[t]acit collusion [or independent conduct] . . . describes the process, *not in itself unlawful*, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions." *Brooke Group Ltd.*, 509 U.S. at 227 (emphasis added). In an oligopolistic setting, the distinction between lawful, independent conduct and illegal conduct is most at issue when circumstantial evidence is used to prove the existence of an agreement to fix prices.

{13} To prove a violation of Section 1 of the Sherman Act, plaintiffs can produce direct or circumstantial evidence of an illegal agreement to fix prices. *See Monsanto Co.*, 465 U.S. at 764. Direct evidence of such an agreement is "explicit and requires no inferences to establish the proposition or conclusion being asserted." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999). In contrast, circumstantial evidence necessarily requires that inferences be drawn. *See Williamson Oil Co.*, 346 F.3d at 1300 ("The problem with this reliance on circumstantial evidence, however, is that such evidence is by its nature ambiguous, and necessarily requires the drawing of one or more inferences in order to substantiate claims of illegal conspiracy."). "While direct evidence, the proverbial 'smoking-gun,' is generally the most compelling means by which a plaintiff can make out his or her claim, it is also frequently difficult for antitrust plaintiffs to come by." *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 465 (3d Cir. 1998).

{14} As a result of the need to draw inferences from circumstantial evidence and the likelihood that parallel conduct in an oligopoly stems from lawful, independent conduct, federal courts require antitrust plaintiffs to present evidence "that tends to exclude the possibility that the alleged conspirators acted independently." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (internal quotation marks and citation omitted); *see also Monsanto Co.*, 465 U.S. at 763 (noting that "it is of considerable importance that independent action by the manufacturer, and concerted action on nonprice restrictions, be distinguished from price-fixing agreements"); *Williamson Oil Co.*, 346 F.3d at 1300 (holding that evidence tending to exclude independent conduct is necessary only

when the plaintiff relies on circumstantial evidence to prove a conspiracy). Without requiring such a showing, pro-competitive conduct, the conduct that the antitrust laws are designed to protect, may be deterred. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 593-94. "[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy . . . [and plaintiffs] must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [them]." *Id.* at 588 (citations omitted).

**{15}** As a result of the limited inferences that can be drawn from circumstantial evidence and the interdependent nature of an oligopoly, the plaintiffs must present more than evidence of parallel pricing to prove the existence of an agreement between the defendants to fix prices. Although "parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, it falls short of conclusively establish[ing] agreement or . . . itself constitut[ing] a Sherman Act offense." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (internal quotation marks and citation omitted) (alterations in original); *see also In re Baby Food Antitrust Litig.*, 166 F.3d at 122 ("[N]o conspiracy should be inferred from ambiguous evidence or from mere parallelism when defendants' conduct can be explained by independent business reasons."). Evidence of parallel pricing without more is inherently ambiguous in the oligopolistic setting because there are so many different means, lawful and unlawful, by which parallel pricing can be achieved. *See* VI Areeda & Hovenkamp, *supra* ¶ 1431b (discussing the numerous explanations for parallel pricing, including "imperfect express collusion, merely interdependent behavior, and fairly independent and non-interdependent conduct").

**{16}** It is the judge's duty to review the evidence presented by the plaintiffs and make a threshold legal determination as to whether it tends to exclude the possibility that the defendants acted independently. *See Williamson Oil Co.*, 346 F.3d at 1304 (holding that the judge does not act as fact-finder, but only makes a determination of the "reasonableness of the inferences that c[an] be drawn from the evidence, [which are] threshold legal determinations that appropriately [are] made by the district court"). If the evidence offered by the plaintiff is ambiguous and can equally lead to the conclusion that the alleged conduct was the result of independent action as opposed to illegal conduct, the plaintiff has failed to establish a genuine issue of material fact that there was a conspiracy. *See Monsanto Co.*, 465 U.S. at 763; *Blauwkamp v. Univ. of N.M. Hosp.*, 114 N.M. 228, 232, 836 P.2d 1249, 1253 (Ct. App. 1992) (holding that failure to establish an essential element of plaintiff's claim is sufficient grounds for summary judgment); *see also In re Baby Food Antitrust Litig.*, 166 F.3d at 118 (noting that plaintiffs must "meet [a] demanding standard of proof required in the context of an antitrust case"); *Bell Atl. Corp.*, 550 U.S. at 554 (recognizing "proof of a § 1 conspiracy must include evidence tending to exclude the possibility of independent action").

**{17}** To assist in determining which evidence would tend to exclude independent action, federal courts have created "plus factors." "[A]ny showing . . . that 'tend[s] to exclude the

10

possibility of independent action' can qualify as a 'plus factor.'" *Williamson Oil Co.*, 346 F.3d at 1301 (citation omitted). These "'plus factors' . . . remove [the plaintiff's] evidence from the realm of equipoise and render that evidence more probative of conspiracy than of conscious parallelism." *Id.* In determining whether evidence constitutes a plus factor, *i.e.*, tends to exclude independent conduct, the court should consider the following: "[I]f a benign explanation for the action is equally or more plausible than a collusive explanation, the action cannot constitute a plus factor," *id.* at 1310; the evidence presented by the plaintiffs must be economically sensible or plaintiffs must "come forward with more persuasive evidence to support their claim," *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d 1, 12 (D.D.C. 2004) ("[I]n the face of economic factors dictating that the nonmoving party's theory is irrational, that party must submit evidence to establish that the theory remains practical and genuine despite economic evidence to the contrary."). In addition, "a showing that the defendants' behavior would not be reasonable or explicable (i.e. not in their legitimate economic self-interest) if they were not conspiring to fix prices or otherwise restrain trade" also constitutes a plus factor. *Williamson Oil Co.*, 346 F.3d at 1301 (internal quotation marks and citation omitted). The requirement of tending to exclude independent conduct necessarily requires that the court view the plaintiffs' evidence in light of the defendants' evidence to determine whether the plaintiffs' evidence tends to exclude the possibility that defendants were acting independently. *See* Rule 1-056(C) NMRA (stating that the judge must review "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits"); *see also Clough*, 108 N.M. at 804-05, 780 P.2d at 630-31 (determining that plaintiff's antitrust conspiracy claim should not survive summary judgment by considering plaintiff's evidence in light of evidence presented by defendants). The phrase "'plus factors' refers simply to the additional facts or factors required to be proved as a prerequisite to finding that parallel action amounts to a conspiracy." VI Areeda & Hovenkamp*, supra* ¶ 1433e. Whether the courts want to call them plus factors or not, the requirement that the plaintiffs tend to exclude independent conduct does not change.

## NEW MEXICO ANTITRUST PLAINTIFFS MUST PRESENT EVIDENCE TENDING TO EXCLUDE THE POSSIBILITY THAT DEFENDANTS ACTED INDEPENDENTLY

**{18}** Plaintiffs allege that Defendants violated the New Mexico Antitrust Act, which states that "[e]very contract, agreement, combination or conspiracy in restraint of trade or commerce, any part of which trade or commerce is within this state, is unlawful." Section § 57-1-1. To prove a cause of action under the Antitrust Act the Legislature requires that "the Antitrust Act *shall* be construed in harmony with judicial interpretations of the federal antitrust laws. This construction shall be made to achieve uniform application of the state and federal laws prohibiting restraints of trade and monopolistic practices." Section 57-1-15 (emphasis added). It is therefore the duty of the courts to ensure that New Mexico antitrust law does not deviate substantially from federal interpretations of antitrust law. *See State v. Guerra*, 2001-NMCA-031, ¶ 14, 130 N.M. 302, 24 P.3d 334 ("The word 'shall' as used in a statute is generally construed to be mandatory.").

**{19}** Federal substantive law as it relates to oligopolies controls in this case. There is no doubt that the tobacco industry, in which five companies manufacture more than 97% of the cigarettes sold in the United States, is a classic oligopoly. *See Williamson Oil Co.*, 346 F.3d at 1291. Because the cigarette industry is an oligopoly, it is likely that when one tobacco company (*i.e.*, Philip Morris) acts in a certain manner (*i.e.*, Marlboro Friday and subsequent price increases), the other firms (RJR, B&W, Lorillard, and Liggett) will determine whether it is in their best interest to follow the leader's actions. As we will discuss below, when Philip Morris began raising prices after Marlboro Friday, RJR's and B&W's conduct in following subsequent price increases was just as likely due to their own independent analysis of what was in their best interests as it was the result of an illegal price-fixing agreement. Therefore, Plaintiffs must present evidence that tends to exclude the possibility that Defendants acted independently or they can not meet their burden of establishing a genuine issue of material fact. Because Plaintiffs rely on circumstantial evidence to prove the existence of a price-fixing agreement, *see Romero*, 2009-NMCA-022, ¶ 20, if they have not presented evidence that tends to exclude the possibility that Defendants acted independently, they have not met their burden of establishing a genuine issue of material fact.

**{20}** Material facts are those "necessary to give rise to a claim," *Eoff*, 109 N.M. at 702, 789 P.2d at 1269, and to give rise to a Section 1 claim, evidence that tends to exclude independent action by the defendants is necessary to show that there was an unlawful agreement. *See Bell Atl. Corp.*, 550 U.S. at 557 ("An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 [Sherman Act] complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of 'entitle[ment] to relief.'"); *see also Monsanto Co.*, 465 U.S. at 763 ("On a claim of concerted price-fixing, the antitrust plaintiff must present evidence sufficient to carry its burden of proving that there was such an agreement."). The United States Supreme Court has explicitly stated that "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Bell Atl. Corp.*, 550 U.S. at 557. Without this showing, an essential element of the conspiracy claim is absent and there can be no issue of material fact.

**{21}** In rejecting the plus factor approach used by the federal courts and holding that parallel conduct can be enough to prove a conspiracy, the Court of Appeals fails to construe the New Mexico Antitrust Act in harmony with judicial interpretations of federal antitrust law required by Section 57-1-15. *See Romero*, 2009-NMCA-022, ¶ 24. This ignores the United States Supreme Court's holding that "[t]he inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market," *Bell Atl. Corp.*, 550 U.S. at 554, and that plus factors are the tool for reviewing the evidence presented, *see* VI Areeda & Hovenkamp*, supra* ¶ 1432a ("We conclude that the Sherman Act § 1 requirement of a contract, combination, or conspiracy is not satisfied by uniform anticompetitive pricing that results *merely* from recognized interdependence without the addition of any

facilitators."). Contrary to the holding of the Court of Appeals that proof tending to exclude independent conduct is not a separate element of Plaintiffs' case, *Romero*, 2009-NMCA-022, ¶ 25, we hold that the requirement that only reasonable inferences can be drawn from ambiguous evidence is a substantive component of federal antitrust law, and that Plaintiffs must present evidence tending to exclude independent conduct to ensure uniform application of federal and state laws. *See* § 57-1-15.

**{22}** In reversing the district court and holding that an agreement to fix prices can be shown only with parallel conduct, the Court of Appeals requires a different quantum of proof than the federal court and, as a result, fails to construe our law in harmony with federal law. The Court of Appeals assumes that a jury could find a conspiracy, *see Romero*, 2009-NMCA-022, ¶¶ 27-30, without discussing Defendants' evidence that the in-tandem increases, shifts in market share, and supposed behavior contrary to self-interest were just as likely the result of independent, rational business decisions made to maximize profits, rather than an agreement to fix prices, because any alternative other than following the price increases was a losing option. In its hypothesis, the Court of Appeals errs in accepting certain plus factors with no discussion of whether they actually tend to exclude independent conduct. *Id.* ¶ 29 (discussing signaling and clandestine communications). Additionally, in assuming the jury could find a conspiracy based solely on parallel behavior, the Court allows an inference that is per se unreasonable. *Id.* Rather than reviewing Plaintiffs' evidence in light of all of the evidence presented, the Court asserts that it just upheld its "obligation to view the evidence in the light most favorable to the non-movant and to allow the non-movant the benefit of any reasonable inferences supported by the evidence . . . ." *Id.* ¶ 31. The Court fails to use substantive federal antitrust law as the filter to first determine whether genuine issues of material fact exist in favor of summary judgment. Instead, the Court employs New Mexico's summary judgment standard to overcome the strict requirements of substantive law. This is exactly the rationale rejected in *Matsushita*. *See* 475 U.S. at 587-88 ("Respondents correctly note that '[o]n summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.' But antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." (citation omitted)).

**{23}** We also disagree with the Court of Appeals in *Romero* that both Dr. Leffler's opinion and *Brooke Group* set forth "major points of departure" from the plus factor approach discussed in *Williamson Oil*. The Court noted that Dr. Leffler stated that "[t]he economic evidence indicates that it is highly unlikely that independent competitive behavior explains the price restructuring and price changes for cigarettes during the alleged conspiracy period." *Id.* ¶ 32 (internal quotation marks omitted). The Court also held that "Dr. Leffler's opinion testimony, if believed, would permit a reasonable factfinder to exclude lawful parallelism as the most likely explanation for the parallelism demonstrated by cigarette prices during the class period." *Id.* Although the Court held that it was "not inclined to appoint [itself an] amateur econo[mist] and attempt to second guess Dr. Leffler's reasoning," *id.* ¶ 39, it did not give consideration to the fact that there were several ambiguities in Dr. Leffler's opinion that were drawn out in his deposition. While Dr. Leffler opined that the parallel price increases

13

were not the result of lawful parallelism, he also agreed that the factors he used to determine the existence of a price-fixing conspiracy could not "tell you one way or the other whether you have conscious parallelism or you've got something beyond conscious parallelism like a price fixing agreement." He also offered the opinion that an explicit agreement was a violation of Section 1 of the Sherman Act as opposed to oligopolistic coordination and there was no explicit agreement in this case. Dr. Leffler stated that rational oligopolists would act to maximize profits, rational oligopolists would have matched the Marlboro Friday price reduction, and RJR and B&W were most likely acting to maximize their profits by failing to re-widen the price gap. Dr. Leffler even went so far as to acknowledge that the cigarette industry "responded as I would have expected them to respond . . . [t]o match the price cut and then to anticipate future price increases, to extend the oligopoly cooperation to the discount sector."

**{24}** In general, Dr. Leffler's report concludes that following Marlboro Friday, Defendants' actions amounted to illegal price-fixing. However, his statements and responses in his deposition demonstrate that he actually thought it was just as likely that Defendants would have behaved in the same manner if they were acting independently and not under an illegal price-fixing agreement, because to act any other way would have been less profitable and, as such, against their economic interest.

**{25}** Without becoming amateur economists, the Court of Appeals could have easily recognized inconsistencies between Dr. Leffler's report and his deposition. Based on these ambiguities in the evidence, it would have been necessary under substantive antitrust law to hold that the evidence did not tend to exclude independent conduct because it was also consistent with independent conduct. *See Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*, 231 F. Supp. 2d 1253, 1270 (N.D. Ga. 2002) ("If, when considered in its entirety, [the evidence] is totally ambiguous or to the opposite effect, it is not relevant and may not be relied upon by the jury."). By holding that such ambiguous evidence tended to exclude independent conduct and would allow the jury to reach a reasonable inference, the Court of Appeals failed to ensure uniform application of state and federal antitrust law.

**{26}** The Court of Appeals also relied heavily on several facets of the United States Supreme Court's analysis in *Brooke Group* to bolster both its reliance on Dr. Leffler's opinion and its conclusion that independent action was an unlikely explanation for the parallel pricing observed during the period of the alleged agreement to fix prices. *Romero*, 2009-NMCA-022, ¶¶ 33-37, 40. In each instance, however, reliance on *Brooke Group* is premised on a misreading of the Supreme Court's analysis. While the Court of Appeals correctly observed that *Brooke Group* recognizes the "inherent limitations" of independent conduct and that it is an "improbable" explanation for "multivariable coordination," that conclusion was based on an analysis of "the net price in the market" or retail pricing, not on list or wholesale prices, which underlie the basis of the claim in the instant case. *Brooke Group Ltd.*, 509 U.S. at 239. Similarly, while *Brooke Group* did analyze "the likelihood that tacit collusion could result in industry-wide, in-tandem increases in the prices of both generic and premium cigarettes," *Romero*, 2009-NMCA-022, ¶ 40, it did so only in the context of

14

retail pricing.

**{27}** Retail pricing is influenced by so many variables that the cigarette oligopoly cannot exert collective control over it through independent conduct. *See Brooke Group Ltd.*, 509 U.S. at 239 (noting that retail prices are determined in part by "list prices, but also by a wide variety of discounts and promotions to consumers and by rebates to wholesalers"). Cigarette wholesalers, who buy direct from cigarette manufacturers at wholesale list prices, set prices for retailers, who then set retail prices for consumers. All levels of pricing are affected by various manufacturer discounts and promotions. Therefore, "to coordinate in an effective manner [at the retail level] . . . the cigarette companies would have been required, without communicating, to establish parallel practices with respect to each of these variables, many of which, like consumer stickers or coupons, were difficult to monitor." *Id.* at 239. This complexity explains why independent conduct is an improbable means of coordinating parallel *retail* pricing and why *Brooke Group* suggests that independent conduct should be rejected as a likely explanation in that circumstance. *Id.* This conclusion, however, cannot be logically extended to wholesale list prices, which are simply determined by the manufacturers. *Brooke Group* is very clear that "it would be *unreasonable* to draw conclusions about the existence of tacit coordination or supracompetitive pricing from data that reflect *only* list prices," because "in an oligopoly setting . . . price competition is most likely to take place through less observable and less regulable means than list prices." *Id.* at 236 (emphasis added).

**{28}** Despite these significant distinctions between *Brooke Group* and the instant case, the Court of Appeals nonetheless suggests that "Defendants' theory of the present case seems . . . easily as complex as the recoupment theory rejected in *Brooke Group*." *Romero*, 2009-NMCA-022, ¶ 36. The Court holds that only a "single-tier market" can be effectively controlled by legal oligopolistic coordination, because a two-tier wholesale market is too complex and has too many variables, making independent conduct an implausible explanation for parallel pricing. *Id.* ¶ 40 ("The present case does not involve the type of simple price leadership in a single-tier market that characterized the tobacco industry prior to the introduction of generic cigarettes."). Finding the two-tier system complex, the Court of Appeals rejects independent conduct as a plausible explanation for the observed list pricing. *Id.* ¶ 37 ("[L]awful oligopolistic coordination was incapable of containing the competition from non-premium cigarettes.").

**{29}** The point of Marlboro Friday and subsequent price reductions, however, was to simplify the wholesale pricing scheme, collapsing the market from ten pricing tiers to two, so there would be a less complex pricing system. Due to the interdependent nature of an oligopoly, "oligopolistic rationality" can "provide for price increases through . . . price leadership[]" if the other firms believe that following the pricing leader will maximize their profits. VI Areeda & Hovenkamp, *supra* ¶ 1429a-b (internal quotation marks omitted) (discussing interdependent decision-making and how the actions of one firm may result in the independent decision of other firms to follow if doing so will maximize profits). To stem the flow of market share into the discount sector, Philip Morris realized the need to close the

price gap between premium and discount cigarettes, and set about undertaking this task with Marlboro Friday and the subsequent price reductions in the premium and discount sectors. With the price gap closed and only two price tiers remaining, Philip Morris was able to take advantage of the expected "oligopolistic rationality" when prices began to ascend to pre-Marlboro Friday levels. Dr. Leffler opined that RJR and B&W were acting as rational oligopolists by following Philip Morris in subsequent price increases to prevent further price cuts similar to Marlboro Friday. Compliance was ensured by the looming threat of continued revenue losses should Philip Morris institute a second Marlboro Friday.[3] By relying on "oligopolistic rationality" and having condensed the ten-tier system to two tiers, Philip Morris used its dominant market position and the inherent interdependencies of the cigarette oligopoly to force the other manufacturers to comply with its subsequent price increases in *both* pricing tiers. These strategic moves were all part of Philip Morris's strategy to "box in its competitors" and advance its own competitive position.

**{30}** Prior to Marlboro Friday, Philip Morris attempted to box in its competitors and reduce the discount-premium price gap by independently raising generic and discount cigarette prices. However, this attempt failed. *Romero*, 2009-NMCA-022, ¶ 37. No discount cigarette manufacturers responded because with ten pricing tiers and the large price gap between discount and premium cigarettes, discount cigarettes could continue to grow revenue by cannibalizing the premium cigarette market share; it was not in their interest at that point to follow Philip Morris's price leadership, and they had no incentive to do so. Contrary to the Court of Appeals's conclusion that "[t]his evidence [supports] Dr. Leffler's opinion that by itself, lawful oligopolistic coordination was incapable of containing the competition from non-premium cigarettes," *Romero*, 2009-NMCA-022, ¶ 37, this initial failure to control discount list prices simply explains Philip Morris's rationale and motivation for both Marlboro Friday and its subsequent pricing strategy. Philip Morris needed to simplify the pricing structure and exert its market influence before the oligopoly would respond to its price leadership.

**{31}** Nothing about the cigarette oligopoly's coordination of the wholesale two-tier market is multi-variable or complex as described in *Brooke Group*. Retail pricing, not list pricing, is multi-variable and complex and makes independent conduct an improbable explanation for parallel pricing. *See Brooke Group Ltd.*, 509 U.S. at 239. Therefore, simultaneous coordinated pricing in both tiers does not, by itself, tend to exclude independent conduct due to complexity. Rather the opposite is true. It is undisputed by Plaintiffs that Philip Morris's Marlboro Friday was the initiation of a highly competitive strategy. That strategy did not end on Marlboro Friday, but persisted throughout the alleged conspiracy as Philip Morris worked to maintain a narrow price gap between discount and premium cigarettes *and* worked

---

[3]Declaration of RJR CEO: "[B]ased on Marlboro Friday, RJR believed that [Philip Morris] would not allow a competitor to take market share away from Marlboro by cutting prices. Thus, RJR believed, any further price reduction would be futile and would result in lower profits."

to raise prices in both tiers. With this strategy, Philip Morris maintained its newly-acquired market share and increased its revenue, while manufacturers that depended on the discount sector lost market share and revenue. Philip Morris sought to regain market share it had lost to the discount sector prior to Marlboro Friday, and over a roughly six-year period, it increased wholesale prices to regain the status quo prior to Marlboro Friday.

**{32}** The result of Philip Morris's market dominance was that premium cigarettes *and* discount cigarettes became subject to interdependent conduct, whereas prior to Marlboro Friday only premium cigarettes were subject to such oligopolistic control. Plaintiffs' expert, Dr. Leffler, stated that Marlboro Friday "caused a restructuring in the industry and a change in the competitive relationships." As a result of this restructuring, oligopolistic functioning and rationale extended to the discount sector where there had been no such functioning prior to Marlboro Friday. Indeed, Dr. Leffler even acknowledged in his deposition that the industry merely "extend[ed] the oligopoly cooperation to the discount sector." As oligopolistic control is lawful in the premium price tier, there is no rationale for arguing that it is illegal in the discount price tier. For these reasons, the Court of Appeals's reliance on *Brooke Group* was misplaced.

**{33}** Thus, we must determine whether Plaintiffs' proffered evidence of plus factors tends to exclude the possibility that Defendants acted independently. Plaintiffs cite to the following plus factors, in addition to parallel pricing, as tending to exclude the possibility that Defendants acted independently: (1) the economies of the marketplace, such as a highly concentrated market, cigarette fungibility, high barriers to entry in the industry, absence of close substitutes, and a history of collusion; (2) a strong motivation to conspire, resulting from the desperate times facing the cigarette industry, including "a dramatic decline in its sales as a result of . . . increased public awareness of the detrimental health effects of smoking"; (3) the condensation of price tiers to facilitate the conspiracy; (4) actions contrary to self-interest, including Philip Morris's pre-announcing its price reductions and Defendants' failure to attempt to re-widen the price gap by reducing discount prices; (5) conspiratorial meetings in other markets; (6) a smoking and health conspiracy; (7) the manner in which Defendants monitored the conspiracy through Management Science Associates ("MSA")[4]; (8) opportunities to conspire; and (9) pricing decisions made at high levels. Although the ambiguities in Dr. Leffler's opinion have previously been discussed, *see supra*, ¶¶ 23-25, we will further review the evidence presented by Dr. Leffler, since this is the only plus factor cited by the Court of Appeals.

**{34}** We reject Plaintiffs' plus factors for reasons similar to those set forth in *Williamson*

---

[4]"[MSA] provides data collection, processing, and storage services to numerous Fortune 500 companies, including American Express, MCI, Coca-Cola, and Michelin Tires." "MSA Inc. shipment-to-wholesale data are aggregated, historical data on manufacturer shipments of cigarettes to wholesalers that manufacturers provide to MSA Inc. for processing, and do not contain any cigarette pricing information."

*Oil Co.* because Defendants' conduct is just as consistent with lawful, independent action as it is with price fixing, and therefore it does not tend to exclude independent conduct. We briefly discuss Plaintiffs' plus factors to address why they do not tend to exclude the possibility of independent conduct by Defendants. (1) The majority of the economies of the marketplace to which Plaintiffs cite are nothing more than inherent characteristics of an oligopoly and cannot tend to exclude independent action. *See Holiday Wholesale Grocery Co.*, 231 F. Supp. 2d at 1305. In fact, Plaintiffs' expert agreed that these factors are "conducive to collusion, whether it be in the form of tacit collusion [independent conduct] or some kind of explicit agreement fixing prices," and that "looking at [these] structural factors alone, just like prices, does not allow you . . . to distinguish between whether the prices in this industry are the result of price fixing conspiracy on the one hand or conscious parallelism on the other hand." In addition, the history of collusion cited by Plaintiffs is based on a 1946 violation of the Sherman Act. *See Am. Tobacco Co. v. United States*, 328 U.S. 781 (1946). However, Plaintiffs do not explain how a case from more than fifty years ago is indicative of a present day price-fixing agreement, especially when only one of the current Defendants, RJR, was a defendant in the 1946 case. *See Williamson Oil Co.*, 346 F.3d at 1317-18. (2) The motivation to conspire cited by Plaintiffs cannot serve as tending to exclude independent conduct because "[p]rofit is a legitimate motive in pricing decisions, and something more is required before a court can conclude that competitors conspired to fix pricing in violation of the Sherman Act." *In re Baby Food Antitrust Litig.*, 166 F.3d at 134-35. (3) When Philip Morris took action to condense the price tiers, it is just as likely that they did so to reduce the price gap and maximize profits as to facilitate a price fixing agreement, and thus this does not tend to exclude independent conduct. (4) Plaintiffs argue that Defendants took actions contrary to self-interest by pre-announcing price decisions and failing to re-widen the price gap. Philip Morris argues that the June 20, 1993 pre-announcement of a price decrease to take effect twenty days later was not a signal to the other cigarette manufacturers, but was made to allow wholesalers and retailers to avoid an immediate reduction in the value of their inventory and to accommodate the burden of implementing a price reduction. *See id.* at 133 (holding that advance price announcements can serve an important purpose in the industry). In addition, failure to re-widen the price gap does not tend to exclude independent conduct. Plaintiffs' expert testified that RJR and B&W were acting as rational oligopolists in following Philip Morris's price reduction, and that RJR and B&W made rational business decisions not to re-widen the price gap because they would not have made more money doing so. *See* VI Areeda & Hovenkamp, *supra* ¶ 1429b (discussing that other firms in an oligopoly will follow the price leader "when they believe that it will maximize industry profits"). (5) The alleged conspiratorial meetings in other markets cannot serve as tending to exclude independent conduct because Plaintiffs offered no support to connect the actions in foreign markets with the actions in the United States. In addition, Plaintiffs' expert testified that he knew of no such connection and price changes in the United States were independent of those in the international market. (6) Similarly, concluding that an alleged smoking and health conspiracy facilitated coordination of a conspiracy in this case would require the jury to engage in speculation, and therefore it does not tend to exclude independent conduct. *See Williamson Oil Co.*, 346 F.3d at 1316-17; *Matsushita Elec. Indus. Co.*, 475 U.S. at 595. (7) The manner in which Defendants

monitored the conspiracy through MSA is not evidence tending to exclude independent conduct because there is an equally rational legal explanation for this such as to "devise competitive strategies, gauge the success of their promotions, monitor the impact of new styles or packing on the market, and determine whether increased promotional spending was needed in certain geographic areas to compete with competitors' programs." In addition, Dr. Leffler acknowledged under oath that the information exchanged was not pricing information. As this information is ambiguous at best, it can not be seen as tending to exclude independent conduct. *See Williamson Oil Co.*, 346 F.3d at 1315. (8) Plaintiffs allege that Defendants had many opportunities to conspire because high- ranking officials from each manufacturer met on numerous occasions. However, the fact that Defendants may have met does not reasonably lead to the inference that they conspired to discuss price fixing. "[M]ere contacts and communications, or the mere opportunity to conspire, among antitrust defendants is insufficient evidence from which to infer an anticompetitive conspiracy . . . ." *Clough*, 108 N.M. at 804, 780 P.2d at 630 (internal quotation marks and citation omitted); *see also Williamson Oil Co.*, 346 F.3d at 1319. (9) Finally, pricing decisions made at high levels do not tend to exclude independent conduct as "[f]irms routinely consolidate decisionmaking authority in high ranking officers for a multitude of wholly legitimate reasons." *Williamson Oil Co.*, 346 F.3d at 1319. In light of the ambiguous nature of Plaintiffs' plus factors, we hold that they do not tend to exclude independent conduct.

{35}    We also affirm the district court's ruling that "even after going through the plus factors, there still exists the opportunity for the defendant to rebut the inference of collusion by presenting evidence establishing that no reasonable fact-finder could conclude that they entered into a price-fixing conspiracy." Plaintiffs and the Court of Appeals erred in failing to acknowledge any legitimate rational explanations for the actions taken by Defendants. Plaintiffs ignore both retail competition and the effect that competition had on the "actual 'transaction' prices." Defendants competed "vigorously" on retail pricing, spending a combined total of over $25 billion. This competition led to RJR and B&W filing a lawsuit against Philip Morris alleging violations of the Sherman Act and unfair competition for conduct that occurred in the midst of the alleged conspiracy. *See R. J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362 (M.D.N.C. 2002). RJR and B&W argued that Philip Morris "designed and executed Retail Leaders to monopolize and restrain trade in the United States cigarette market by paying retailers for advantageous display and signage space which Plaintiffs say restricts information needed by consumers, disrupts the price-setting mechanism of the market, and limits Plaintiffs' abilities to promote their products." *Id.* at 365. It would be unreasonable to infer that companies who fiercely competed at the retail level to the extent of suing one another would at the same time agree to fix prices.

{36}    Plaintiffs also fail to explain the economic rationale for Defendants competing so fiercely on retail promotions that would undermine any benefit they may have been receiving from a price-fixing conspiracy at the wholesale level. *See Williamson Oil Co.*, 346 F.3d at 1321 ("[I]f prices are fixed . . . there is no rational reason to undertake extremely significant

19

and expanding retail promotional expenditures, which are a paradigmatically competitive activity."). From 1994 to 1999, Philip Morris's increased spending on retail promotions increased by $1.651 billion, which equaled 60% of its operating income. From 1993 to 1999, RJR's increased spending on retail promotions increased by $570 million, which was 141.6% of its operating income. B&W increased its spending on retail promotions from 1992 to 1998 by $492.5 million. This retail competition caused retail prices to vary, "even among brands that were priced identically at list."

**{37}** In addition, market shares did not remain static but shifted and resulted in clear winners, such as Philip Morris, and clear losers, such as RJR and B&W. Philip Morris walked away a winner by ensuring that the price gap remained at a desirable level, while RJR and B&W, both of which had relied heavily on discount cigarettes, lost market share. During the period of the alleged conspiracy, Philip Morris's market share grew from 42.2% to 50.5%; RJR's share shrunk from 30.6% to 23.0%; and B&W's share declined from 16.6% to 11.7%. These shifts in market share also resulted in substantial revenue adjustments, further highlighting the winners and losers. For example, "in 1999 alone [Philip Morris] realized an additional $2.9 billion in revenues as a result of its cumulative increase in market share since 1993." In 1999, RJR was down approximately $3 billion in annual revenues compared to 1993, and B&W lost $1.3 billion in annual revenues from 1993 to 1999. Plaintiffs offer no evidence to explain why RJR and B&W would participate in a conspiracy that would result in lost market share and revenue. Rather, it is more likely that RJR and B&W acted as they did because it was the best option for them to follow out of a number of bad options. Philip Morris argued that each price increase subsequent to Marlboro Friday was for legitimate business reasons and independently made. Philip Morris stated that Plaintiffs had produced no evidence to support the allegation that the pricing actions taken were "intended to accomplish anything other than to advance [Philip Morris's] economic self-interest." There is no doubt that Marlboro Friday was a competitive act. In fact, Plaintiffs' economic expert stated that RJR and B&W were acting to maximize their profits in the way they reacted to Marlboro Friday and that any other options, such as attempting to reduce the price gap, would have led to inferior profits. In other words, Defendants had no choice but to follow the lead of Philip Morris and Plaintiffs failed to present evidence showing otherwise.

**{38}** Defendants made a prima facie case supporting summary judgment by providing evidence of fierce retail competition that undermined the plausibility of a price-fixing agreement, demonstrating that wholesale prices remained lower than pre-Marlboro Friday levels and did not exceed pre-Marlboro Friday levels until almost five years later, and by highlighting the ambiguities in Dr. Leffler's opinion. This evidence showed that Defendants "'had no rational economic motive to conspire, and . . . their conduct is consistent with other, equally plausible explanations.'" *Clough*, 108 N.M. at 804, 780 P.2d at 630 (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 596-97). In reviewing Plaintiffs' plus factors, we find that the district court properly granted summary judgment.

**CONCLUSION**

**{39}** Failing to produce evidence tending to exclude independent action, Plaintiffs have not raised a genuine issue of material fact that there was an agreement between Defendants to fix the prices of cigarettes. Therefore, we reverse the Court of Appeals and affirm summary judgment in favor of all Defendants.

**{40}  IT IS SO ORDERED.**

_____

**EDWARD L. CHÁVEZ, Justice**

**WE CONCUR:**

_____

**CHARLES W. DANIELS, Chief Justice**

_____

**PATRICIO M. SERNA, Justice**

_____

**PETRA JIMENEZ MAES, Justice**

_____

**RICHARD C. BOSSON, Justice**

**Topic Index for _Romero v. Philip Morris,_ Docket No. 31,433**

| | |
|---|---|
| **CM** | **COMMERCIAL LAW** |
| CM-AN | Antitrust |
| CM-UP | Unfair Practices Act |
| | |
| **CO** | **CIVIL PROCEDURE** |
| CP-SJ | Summary Judgment |
| | |
| **EV** | **EVIDENCE** |
| EV-CV | Circumstantial Evidence |
| | |
| **FL** | **FEDERAL LAW** |
| FL-AN | Antitrust |
| | |
| **MS** | **MISCELLANEOUS STATUTES** |
| MS-AN | Antitrust Act |
| MS-UP | Unfair Practices Act |