The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number:_____

Filing Date: June 10, 2025

**No. A-1-CA-41227**

**MARINA AVILA f/k/a MARIE AVILA-GOMEZ,**

      Plaintiff-Appellant,

v.

**BUTT THORNTON & BAEHR, P.C.**
**and GREYHOUND LINES, INC.,**

      Defendants-Appellees.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Daniel E. Ramczyk, District Court Judge**

Anaya Law, LLC
Edward Marcelino Anaya
Albuquerque, NM

for Appellant

Littler Mendelson, P.C.
R. Shawn Oller
Sarah K. Watt
Phoenix, AZ

for Appellee Greyhound Lines, Inc.

Dixon Scholl Carrillo P.A.
Gerald G. Dixon
James C. Wilkey
Albuquerque, NM

for Appellee Butt Thornton & Baehr, P.C.

**OPINION**

**HANISEE, Judge.**

{1}  This case arises from the termination of Plaintiff Marina Avila's employment by Defendant Greyhound Lines, Inc. (Greyhound). Three distinct legal questions are before this Court. The first asks whether the agency immunity available to corporate officers announced in *Ettenson v. Burke*, 2001-NMCA-003, ¶¶ 20, 21, 130 N.M. 67, 17 P.3d 440, applies as well in this instance to attorneys as agents representing their clients. Plaintiff argues the district court erred in granting Defendant Butt Thornton & Baehr, P.C.'s (BTB) motion to dismiss upon answering this question affirmatively. We conclude such immunity is not presently supported by New Mexico jurisprudence. As such, BTB's motion to dismiss was improperly granted. For the second and third questions before us, Plaintiff argues that the district court erred in granting Greyhound's motions for summary judgment on her implied contract and retaliatory discharge claims. We agree on the former, but not the latter. We affirm in part and reverse in part.

**BACKGROUND**

{2}  Plaintiff was the customer experience manager for Greyhound from September 2016 until May 2018. One of Plaintiff's responsibilities was to preserve video surveillance sought for future use in legal proceedings. In August 2017, the federal public defender's office sent such a preservation request to Greyhound, but

Plaintiff failed to preserve the footage. The next month, a federal district court granted the federal public defender's motion for an ex-parte subpoena on Greyhound for the footage. Greyhound responded that the footage had not been preserved because Plaintiff misunderstood that she was required to do so.

{3}    Plaintiff was called to testify regarding Greyhound's failure to preserve the evidence in April 2018. Before Plaintiff's court appearance, she met with Greyhound's local counsel, BTB attorneys Phillip Cheves and Allison Beaulieu, to prepare for the hearing. After hearing Plaintiff's testimony, the federal district court determined that Greyhound did not comply with the preservation request because Plaintiff was mistaken about Greyhound's policy. Greyhound terminated Plaintiff about a month after she testified.

{4}    Plaintiff filed a complaint against Greyhound and BTB in January 2019 alleging that Greyhound, through its local counsel, BTB, attempted to coach, pressure, and intimidate Plaintiff into perjuring herself in court and that she was fired after refusing to do so. She further alleged that she had an implied contract that entitled her to termination only for cause and progressive discipline prior thereto. She made claims asserting breach of an implied contract and retaliatory discharge against Greyhound; intentional interference with contractual and prospective contractual relationships against BTB; and civil conspiracy against the two. BTB

filed a motion to dismiss for failure to state a claim, arguing, in relevant part, that BTB was immune from suit based on the agent immunity rule.

{5} After full briefing and a hearing, the district court granted BTB's motion to dismiss based on agency immunity. Plaintiff moved to amend her complaint against BTB, which, following briefing and a hearing, the district court declined to permit. Plaintiff next sought interlocutory review of the question of BTB's immunity, which this Court denied.

{6} Plaintiff and Greyhound next litigated the remaining claims in district court—by then to a different judge—until Greyhound filed separate motions for summary judgment on Plaintiff's breach of implied contract claim, civil conspiracy claim, and retaliatory discharge claim. After full briefing and a hearing, the district court granted all three motions. In its order, the district court determined that Plaintiff agreed there was no evidence of a conspiracy and therefore had not opposed Greyhound's first motion. As to the second motion, the district court concluded there to be no material issues of fact regarding the breach of implied contract claim, and that as an at-will employer Greyhound had the right to terminate Plaintiff at any time for any reason. Lastly, the district court determined there was no evidence to support Plaintiff's theory that she was terminated in retaliation for testifying truthfully in the federal criminal matter or that Greyhound tried to force her to lie in contravention of any protected public policy. Plaintiff appeals.

## DISCUSSION

### I.  Qualified Agency Immunity for Attorneys

{7}  Plaintiff argues that the district court erred in granting BTB's motion to dismiss her contract- and conspiracy-based claims against BTB. Plaintiff argues *Ettenson*, 2001-NMCA-003, is wholly inapplicable to the case at bar because it bestowed immunity merely to officers of a corporation acting as agents thereof in a corporate employment structure, and not the corporation's attorneys. On the briefing before us, and on the complete absence of such immunity for attorneys in our case law, we determine the district court improperly granted BTB's Rule 1-012(B)(6) NMRA motion. We explain.

{8}  Orders of dismissal for "failure to state a claim" under Rule 1-012(B)(6) garner de novo review. *Healthsource, Inc. v. X-Ray Assocs. of N.M., P.C.*, 2005-NMCA-097, ¶ 16, 138 N.M. 70, 116 P.3d 861. In considering a motion to dismiss under this rule, we test "the legal sufficiency of the complaint, not the factual allegations of the pleadings, which, for purposes of ruling on the motion, the court must accept as true." *Herrera v. Quality Pontiac*, 2003-NMSC-018, ¶ 2, 134 N.M. 43, 73 P.3d 181 (internal quotation marks and citation omitted). Accepting all well-pleaded factual allegations in the complaint as true, we "resolve all doubts in favor of sufficiency of the complaint." *Delfino v. Griffo*, 2011-NMSC-015, ¶ 9, 150 N.M. 97, 257 P.3d 917 (internal quotation marks and citation omitted). Dismissal under

Rule 1-012(B)(6) is appropriate only where the nonmoving party is "not entitled to recover under any theory of the facts alleged in their complaint." *Delfino*, 2011-NMSC-015, ¶ 12 (internal quotation marks and citation omitted).

{9}     Here, the district court adopted two separate immunities—an intracorporate conspiracy immunity, which dismissed Plaintiff's conspiracy claim, and agency immunity, which dismissed Plaintiff's intentional interference with contractual relationship and prospective contractual relationship claims. The district court relied on this Court's opinion in *Ettenson*, 2001-NMCA-003, and out-of-state authority to establish each immunity. Thus, *Ettenson* is crucial to our inquiry.

{10}     Generally, "an agent may be held individually liable for [their] own tortious acts, whether or not [they were] acting for a disclosed principal." *Kreischer v. Armijo*, 1994-NMCA-118, ¶ 5, 118 N.M. 671, 884 P.2d 827. Our case law has regularly assessed the applicability of this principle in the corporate setting. *See Fogelson v. Wallace*, 2017-NMCA-089, ¶ 50, 406 P.3d 1012; *Kaveny v. MDA Enters., Inc.*, 2005-NMCA-118, ¶ 20, 138 N.M. 432, 120 P.3d 854; *Bogle v. Summit Investment Co.*, 2005-NMCA-024, ¶ 18, 137 N.M. 80, 107 P.3d 520. But in *Ettenson*, 2001-NMCA-003, this Court deviated from the general principle. *Ettenson* addressed a corporate officer's immunity for claims of interference with the contracts of their own corporation. *Id*. ¶¶ 15-21. While *Ettenson* rejected the defendants' view that "corporate officers are simply surrogates of the corporation,

entitled to absolute immunity from suits for tortious interference with contract," it held that corporate officers are protected by qualified immunity. *Id.* ¶ 20. Thus, corporate agents "are privileged to interfere with or induce breach of the corporation's contracts or business relations with others as long as their actions are in good faith and for the best interests of the corporation." *Id.* ¶ 18. Our Supreme Court adopted *Ettenson*'s qualified immunity for corporate officers interfering with corporate contracts in *Deflon v. Sawyers*, 2006-NMSC-025, ¶ 9, 139 N.M. 637, 137 P.3d 577.

{11}   *Ettenson* and *Deflon* both involved claims of tortious interference with a contract, while the former also included a conspiracy claim. *See Ettenson*, 2001-NMCA-003, ¶¶ 17, 20; *Deflon*, 2006-NMSC-025, ¶ 7.[1] Thus, to the extent these cases guide our query regarding whether BTB is entitled to the immunity that protects a corporate officer in certain circumstances, neither requires that we undertake separate analyses for the asserted torts and the unrelated conspiracy as did the district court in applying principles of intracorporate conspiracy immunity and agency immunity. Stated differently, if agency theory provides BTB immunity for

---

[1]*Deflon* involved corporate officer employee defendants, as did *Ettenson*, but also questions regarding the scope of those officers' authority from the standpoint of determining if they were in privity with the corporation for which they worked. *Deflon*, 2006-NMSC-025, ¶¶ 1, 10. Nothing about *Deflon*, however, expanded the reach of *Ettenson*, unlike the order of the district court herein.

Plaintiff's tortious interference claims under *Ettenson*, 2001-NMCA-003, ¶ 17, such would apply equally to her conspiracy claim.

{12} Given this case involves retained attorneys and not corporate officers acting as agents of the corporation for which they work, *Ettenson*—as Plaintiff centrally contends—is not on point for our inquiry. To reiterate, the question raised herein, and which the district court took up, is whether nonemployee attorneys are protected agents of their clients in an analogous fashion to corporate officers. We disagree with the answer to this question given by the district court, and conclude *Ettenson* does not stand for that proposition and that attorneys—being neither officers nor employees of the corporation they represent—are insufficiently analogous to those individuals whom *Ettenson* determined were protected by qualified immunity.

{13} BTB's argument in support of the finding of a qualified immunity here is rooted in the fact that the qualified immunity applied in *Ettenson* and *Deflon* is based in agency theory. *See Ettenson*, 2001-NMCA-003, ¶ 17 (assessing jurisprudence and noting the majority view that agency immunity is qualified—not absolute—and citing the Restatement (Second) of Agency §§ 343-46 (1958), "which characterizes an agent's tort liability to a third party in terms of a limited privilege"); *Deflon*, 2006-NMSC-025, ¶ 7 (noting that a federal court's decision that a president of a corporation was not liable for tortious interference with a contract was premised "on the implicit finding that the president was acting as an agent of the corporation, and

therefore was not a third party to the contract"). BTB argues that since attorneys are, as a matter of law, agents of their client, *see Marchman v. NCNB Tex. Nat'l Bank*, 1995-NMSC-041, ¶¶ 55-56, 120 N.M. 74, 898 P.2d 709, it follows that the qualified immunity applied in *Ettenson*, as applied to corporate officers, should apply here to attorneys as agents of their clients. Indeed, BTB summarizes its argument by asserting, "[Q]ualified immunity under the agent's immunity rule should apply to attorneys who act in service of their clients' interests—just as it does to corporate officers and directors who act in the interests of the corporations they serve."

{14}    We are not convinced. First, in *Marchman*, our Supreme Court determined it was not an abuse of discretion to sanction a plaintiff for the acts of their attorneys. 1995-NMSC-041, ¶¶ 55-56. Though it used the agency theory regarding litigants and their attorneys to make this conclusion, *Marchman* provides tenuous scaffolding to the much broader conclusion that the same theory of agency bestows attorney immunity. We decline to combine the agency relationship that was acknowledged in a completely different circumstance—a sanctions award against a party for the act of their attorney, *see id.*—with an immunity expressly applicable to only corporate officers, *see Ettenson*, 2001-NMCA-003, ¶ 17, to establish an immunity for attorneys.

{15}    Second, were we to extend immunity to attorneys retained to represent corporations—even those that otherwise employ corporate officers that would be

qualifiedly immune from suit under *Ettenson*—a second question immediately emerges: Are attorneys who are generically retained as agents to represent a given client likewise entitled to qualified immunity from lawsuits given all attorneys' roles as agents of their clients during the course of their representation? Our reluctance to so conclude rests on our view that the agency relationship between attorneys and their clients is not the equivalent of, even if it is akin to, the relationship of an employee-officer to their corporation. This may well be the reason New Mexico appellate jurisprudence is bereft of authority bestowing any degree of immunity to retained counsel, and given no such precedent has emerged, we decline to so hold.

{16}    Third, although we acknowledge a qualified privilege of immunity for attorneys, as agents of their clients, is recognized in some other jurisdictions, *see Heffernan v. Hunter*, 189 F.3d 405, 411-14 (3d Cir. 1999) (acknowledging "the general rule that a corporation cannot conspire with its agents" and concluding that the attorney there at issue was acting in "the scope of the attorney-client relationship," so, no conspiracy could be established), even in jurisdictions that recognize such, the contours and limitations of this immunity are not aligned. In advancing their arguments for and against attorney immunity herein, neither BTB nor Plaintiff addresses the moving target that is the nature of attorney immunity in

jurisdictions that recognize such to some degree.[2] Suffice it to say, the absence of uniformity—even in jurisdictions that offer some immunity to attorneys in certain circumstances—does not well lend itself to the creation of such protection in New Mexico.

{17}     We briefly pause to address the dissent, which states that we are "brushing aside the general rule recognized in *Marchman*, 1995-NMSC-041, ¶¶ 55-56, that lawyers are agents of their clients" and asserts that we have not identified error sufficient to justify reversal. *Dissent* ¶¶ 46-48. However, our analysis here does not question the well-established agency relationship attorneys have with their clients. *See, e.g.*, *Marchman*, 1995-NMSC-041, ¶ 56 ("The clients are principals, the attorney is an agent." (internal quotation marks and citation omitted)). Rather, our conclusion rests on the fact that mere status as an agent does not on its own make

---

[2] *See Heffernan*, 189 F.3d at 411-14; *see also Travis v. Gary Cmty. Mental Health Ctr., Inc.*, 921 F.2d 108, 110-11 (7th Cir. 1990) (noting "that managers of a corporation jointly pursuing its lawful business do not become 'conspirators' when acts within the scope of their employment are said to be discriminatory or retaliatory" and applying the immunity to attorneys); *Doherty v. Am. Motors Corp.*, 728 F.2d 334, 340 (6th Cir. 1984) (noting the corporate agency immunity applied to in-house and outside counsel and that it ascertained "no evidence whatsoever of unlawful or unethical conduct on the part of [the corporation's counsel], let alone conduct which would permit a jury to infer that he was conspiring with [the corporation] to affect [the plaintiff]'s right"); *Logan v. Morgan, Lewis & Bockius LLP*, 350 So. 3d 404, 412-13 (Fla. Dist. Ct. App. 2022) (determining that Florida contains "no per se bar to civil conspiracy claims against attorneys who help their clients breach a fiduciary duty to or defraud another," but noting that some courts have extended a qualified immunity to attorneys if they are acting outside the scope of their representation).

one a corporate officer, or even particularly analogous to one, and none of the cases cited herein support the notion that an immunity expressly created for the conduct of a corporate official acting in furtherance of the employer-corporation's interests has any applicability to an attorney with no such control over the corporation. *See Officer*, *Black's Law Dictionary* (12th ed. 2024) (defining "officer" in corporate law as "a person elected or appointed by the board of directors to manage the daily operations of a corporation, such as a CEO, president, secretary, or treasurer"). Attorneys, even when acting as agents for corporate clients, do not possess any of the powers or duties associated with "manag[ing] the daily operations of a corporation," and we see no basis to affirm the district court's conclusion that an immunity created to protect such activities applies to attorneys. *See id.*

{18}    Lastly, we briefly note that agency-derived lawyer immunity is an area in which our Supreme Court has not spoken. Our holding today is consistent with the circumstance that has been previously in place in New Mexico jurisprudence; that is, despite serving as agents to clients, lawyers are not immune from suit even in instances in which they act in good faith and in the best interest of their clients. Our Supreme Court may wish to consider and supply such qualified immunity, but in our view, *Ettenson* and *Deflon* are cases that apply in a specific context—corporate officers acting as agents of their companies—and are therefore poor vehicles to effectuate a novel and broadly applicable form of attorney immunity such as the one

sought by Defendants herein and on which the district court relied in dismissing Plaintiff's complaint against BTB.

**{19}** To summarize, we lack a basis to affirmatively apply an *Ettenson*/*Deflon* immunity to the actions of attorneys in this state on behalf of their clients, even when those clients are corporations whose officers would otherwise fit within the *Ettenson* umbrella of qualified immunity. Unless and until such an immunity is instituted by our Supreme Court, thereby altering the landscape by which litigation against attorneys may proceed in New Mexico courts, the district court's conclusion that qualified immunity is available to BTB cannot be upheld. We therefore reverse the district court's order granting BTB's motion to dismiss.

## II. Implied Contract

**{20}** Plaintiff next argues that she raised a genuine issue of material fact regarding her implied contract claim against Greyhound. "Summary judgment is reviewed on appeal de novo." *Juneau v. Intel Corp.*, 2006-NMSC-002, ¶ 8, 139 N.M. 12, 127 P.3d 548. We review the evidence "in the light most favorable to the party opposing summary judgment." *City of Albuquerque v. BPLW Architects & Eng'rs, Inc.*, 2009-NMCA-081, ¶ 7, 146 N.M. 717, 213 P.3d 1146. "In New Mexico, summary judgment may be proper when the moving party has met its initial burden of establishing a prima facie case for summary judgment." *Romero v. Philip Morris Inc.*, 2010-NMSC-035, ¶ 10, 148 N.M. 713, 242 P.3d 280. "Once this prima facie

showing has been made, the burden shifts to the non[]movant to demonstrate the existence of specific evidentiary facts which would require trial on the merits." *Id.* (internal quotation marks and citation omitted). We begin with case law regarding implied contracts before addressing whether summary judgment was appropriate here.

{21} "The general rule in New Mexico is that an employment contract is for an indefinite period and is terminable at the will of either party unless the contract is supported by consideration beyond the performance of duties and payment of wages or there is an express contractual provision stating otherwise." *Hartbarger v. Frank Paxton Co.*, 1993-NMSC-029, ¶ 4, 115 N.M. 665, 857 P.2d 776. As an exception to this general rule, our Supreme Court has held that a "valid written contract[]" may be implied. *Garcia v. Middle Rio Grande Conservancy Dist.*, 1996-NMSC-029, ¶¶ 14-15, 121 N.M. 728, 918 P.2d 7. "Whether an implied employment contract exists is a question of fact, and it may be found in written representations such as an employee handbook, in oral representations, in the conduct of the parties, or in a combination of representations and conduct." *Id.* ¶ 10 (emphasis, internal quotation marks, and citation omitted); *see Newberry v. Allied Stores, Inc.*, 1989-NMSC-024, ¶ 10, 108 N.M. 424, 773 P.2d 1231 (stating that an "implied contract is an agreement in which the parties[,] by . . . course of conduct[,] have shown an intention to be bound by . . . agreement" (emphasis, internal quotation marks, and citation omitted)).

In New Mexico, "a personnel manual gives rise to an implied contract if it controlled the employer-employee relationship and an employee could reasonably expect his employer to conform to the procedures it outline[s]." *Id.* ¶ 7.

{22} Whether an implied contract has been established is an issue of fact and it ordinarily should not be decided on summary judgment. *See Kiedrowski v. Citizens Bank*, 1995-NMCA-011, ¶ 9, 119 N.M. 572, 893 P.2d 468. However, "an employer may be entitled to judgment as a matter of law if the employee's expectations are not objectively reasonable." *West v. Wash. Tru Sols., LLC*, 2010-NMCA-001, ¶ 7, 147 N.M. 424, 224 P.3d 651.

{23} Against this legal backdrop, we examine the district court's stated rationale in granting summary judgment to Greyhound as to this issue. At the hearing on Greyhound's motion, the district court asked the parties if there were any disputed issues of material fact, which both denied. The district court went on to hear presentations from both parties, including legal arguments. In the district court's ensuing order, it determined that because Plaintiff agreed there were no material facts in dispute, Greyhound had the right to terminate Plaintiff for any reason. Our review of the record, however, suggests that while the parties agreed that the facts were undisputed, they disagreed regarding the legal conclusion arising from those facts—whether the totality of the circumstances indicated it was objectively reasonable for Plaintiff to believe she had an implied contract with Greyhound. Thus,

summary judgment was not appropriate based solely on Plaintiff's concession that there were not disputed material facts. So, we turn to the arguments regarding the legal significance of the facts established by the parties. *See Dominguez v. Perovich Properties, Inc.*, 2005-NMCA-050, ¶ 9, 137 N.M. 401, 111 P.3d 721 ("There being no genuine issue of material fact, we review the grant of summary judgment in this case de novo, determining whether [the defendant] is entitled to dismissal of [the p]laintiff's claims as a matter of law.").

{24}     We limit our analysis to whether Plaintiff may have been entitled to progressive discipline before termination under Greyhound's employee handbook.[3] Plaintiff initially alleged in her complaint that an implied contract existed between Plaintiff and Greyhound "wherein Greyhound would follow certain procedures before disciplining and/or terminating [Plaintiff]'s employment." We start by noting that the employee handbook includes a section titled "PROGRESSIVE DISCIPLINE," wherein it states,

> [Greyhound] believes that it is a sound business practice to provide a means whereby unacceptable job performance or misconduct can be identified and corrected when reasonable. [Greyhound] also recognizes that it is not a sound business practice to condone or tolerate chronic, unacceptable job performance or behavior.
>
> The objective of performance counseling is improved performance by the employee. This will be best accomplished if communication is

---

[3]We note that both parties' arguments to this Court relied solely on the facts that supported their position and did not reckon with the totality of the circumstances as is required. *See Newberry*, 1989-NMSC-024, ¶ 7. This hindered our review.

clear. Employees will be more motivated to improve performance if they understand what is required.

When an employee exhibits a difference between established performance or conduct standards and actual performance or conduct, the differences should be addressed by the employee's manager through the application of the appropriate elements of the progressive discipline process described on the following pages of this policy. As a general rule, the first counseling session is verbal but should be documented. Subsequent counseling on the same, or similar problem is more formal and written records are maintained with the original placed in the employee's personnel file.

{25} An employee handbook may constitute an implied contract, but not all personnel manuals give rise to an implied employment contract. *Garcia*, 1996-NMSC-029, ¶ 11. Handbook language of a nonpromissory nature that is merely a declaration of the employer's general approach to the subject matter does not create an implied contract. *See Sanchez v. The New Mexican*, 1987-NMSC-059, ¶¶ 11-12, 106 N.M. 76, 738 P.2d 1321; *Stieber v. J. Publ'g Co.*, 1995-NMCA-068, ¶ 13, 120 N.M. 270, 901 P.2d 201. "The reasonableness of expectations is measured by just how definite, specific, or explicit has been the representation or conduct relied upon." *Hartbarger*, 1993-NMSC-029, ¶ 14.

{26} In its motion for summary judgment, Greyhound presented evidence that established a prima facie case that an implied contract entitling Plaintiff to progressive discipline did not exist between Plaintiff and Greyhound. This evidence included a written notice given to Plaintiff when she applied for her position at Greyhound in 2016 that stated,

If an employee relationship is established, I understand that such employment is terminable at will at any time, for any reason with or without cause, and with or without notice. I also understand that any period of employment is not for any specific duration. In addition[], I understand that no one is authorized to make oral exceptions to this policy, and written exceptions are permitted only when they are signed by the [p]resident of FirstGroup or Greyhound . . . or [their] designee.

Plaintiff also signed her offer letter that stated,

Your employment at Greyhound . . . is as an "at-will" employee and this document does not alter your "at-will" status. Your employment may be terminated by you or the company at any time, and for any reason, with or without notice. No one other than the [p]resident can enter into any contrary agreement, and such agreement must be in writing, signed by you and the [p]resident.

Plaintiff further signed an acknowledgement regarding the employee handbook that stated,

I understand and agree that unless I have signed an agreement to the contrary or I am employed pursuant to a collective bargaining agreement, my employment with Greyhound remains at will, meaning that it is not for a specified period of time and the employment relationship may be terminated at any time for any reason, with or without cause or notice by me or Greyhound.

The employee handbook itself states, "This handbook is not a contract of employment between Greyhound and any employee and Greyhound may revise, delete or add to the policies, procedures and benefits referred to in this handbook at any time with or without notice."

{27} Despite these facts to which the parties agree, we must nonetheless reckon with our precedent that establishes "an implied contract can still exist in spite of a

disclaimer, where the employer's conduct reasonably leads employees to believe that they will not be terminated without just cause and a fair procedure." *Kiedrowski*, 1995-NMCA-011, ¶ 8. So, we turn to the evidence Plaintiff presented to determine whether she met her responsive burden to demonstrate a question of material fact exists regarding an implied contract based on the totality of the circumstances. *See Newberry*, 1989-NMSC-024, ¶ 7.

{28}     The first piece of evidence Plaintiff argues establishes she had an objectively reasonable expectation that she was entitled to progressive discipline is the policy itself to which Greyhound admitted Plaintiff was subject. Greyhound counters that the progressive discipline policy is a "general rule" and does not require that progressive discipline be provided in every instance. In *Garcia*, our Supreme Court assessed an employer's personnel policy that "contain[ed] provisions relating to most every aspect of an employment relationship." 1996-NMSC-029, ¶ 12. The policy contained a section that stated,

> An employee may be demoted or reclassified to another position and pay for which he is qualified, or have his pay in the same position reduced (a) when he would otherwise be terminated; or (b) when he does not possess the necessary qualifications to render satisfactory service in the position he holds, or is recommended for separation during probation; or (c) when he voluntarily requests such demotion or reclassification.

*Id.* It further contained a section titled "Administrative Remedies" applicable when a personnel action resulted in suspension, termination or demotion. *Id.* Our Supreme

Court held that the policy was sufficiently specific that employees could reasonably rely on its provisions and determined a genuine issue of material fact existed regarding the existence of an implied contract. *See id.* The *Garcia* policy—which employed the permissive "may," *id.*—is substantially similar to Greyhound's policy, which also uses suggestive, vague, and imprecise language and states that differences between employee performance and established standards "*should* be addressed by the employee's manager through the application of the appropriate elements of the progressive discipline process described on the following pages of this policy." We note that *Garcia* did not include multiple signed documents acknowledging the at-will nature of the employee-plaintiff's employment.

{29}    The next piece of evidence Plaintiff relies on is her affidavit stating that she was instructed by her supervisor to administer progressive discipline to other employees at Greyhound. Plaintiff actively administered progressive discipline and understood that the employees she hired as a manager were entitled to progressive discipline despite their hiring documentation including at-will disclaimers. We note that evidence that an employer's general practice of not terminating employees absent good cause does not establish by itself that its employment policy is something other than at will. *See Zarr v. Wash. Tru Sols., LLC*, 2009-NMCA-050, ¶ 22, 146 N.M. 274, 208 P.3d 919; *Hartbarger*, 1993-NMSC-029, ¶ 19. This axiom of implied employment contract law is relevant to the extent that Greyhound's

practice of providing progressive discipline alone would not be sufficient to establish an implied contract. Be that as it may, neither *Hartbarger* nor *Zarr* included a written policy that could have been read to suggest the employers in those cases deviated from at-will employment, which is the case here. *See Hartbarger*, 1993-NMSC-029, ¶¶ 2-3; *Zarr*, 2009-NMCA-050, ¶¶ 19-20. Indeed, a supervisor instructing Plaintiff to enact the written policy for other employees provides some support for Plaintiff's reasonable belief that she too was entitled to depend on the written policy should the need ever arise.

{30}     Finally, the acknowledgement in the employee handbook that Plaintiff signed includes a section that states, "I acknowledge that I have received and reviewed a copy of the Greyhound . . . [e]mployee handbook. I understand and agree that the handbook *sets forth policies affecting my employment with Greyhound . . .* , and it is my responsibility to familiarize myself with the handbook provisions." We note that on the very same page of this document Plaintiff acknowledged that she could be terminated at any time for any reason with or without cause or notice, and that the handbook is not a contract. Yet, our Supreme Court has been clear that

> [e]mployers are certainly free to issue no personnel manual at all or to issue a personnel manual that clearly and conspicuously tells their employees that the manual is not part of the employment contract . . . . Such actions instill no reasonable expectations of job security and do not give employees any reason to rely on representations in the manual. However, if an employer does choose to issue a policy statement, in a manual or otherwise, and, by its language or by the employer's actions, encourages reliance thereon, the employer cannot be free to only

selectively abide by it. Having announced a policy, the employer may not treat it as illusory.

*Lukoski v. Sandia Indian Mgmt. Co.*, 1988-NMSC-002, ¶ 7, 106 N.M. 664, 748 P.2d 507 (omission, internal quotation marks, and citation omitted); *Newberry*, 1989-NMSC-024, ¶ 7; *Garcia*, 1996-NMSC-029, ¶ 13 (same). After setting out a policy seeming to require that Plaintiff comply with the employee handbook by stating the handbook "sets forth policies affecting [Plaintiff's] employment" and demanding she familiarize herself with the policies and procedures therein and that she implement the policy as to other employees, a fact-finder could conclude that Greyhound could not selectively abide by the employee handbook without saying which parts of it—including the progressive discipline policy—are not expected to be followed. Indeed, such a construct, once chosen to exist at all and be used in the manner Greyhound did, could be interpreted by a finder of fact to require progressive discipline prior to termination of employment.

{31} As we noted above, we must determine if a genuine issue of material fact exists as to whether it was objectively reasonable for Plaintiff to expect that she would be terminated in accordance with specific procedures. *See West*, 2010-NMCA-001, ¶ 7. Facts exist supporting either outcome given Plaintiff regularly acknowledged in writing that she understood her employment was at will and that she could be terminated at any time. But, on the other hand, as stated, Greyhound issued a written policy including a progressive discipline policy that "affect[ed]

[Plaintiff's] employment" and that a supervisor instructed Plaintiff to enact for other employees. We conclude that the evidence could permit a jury to conclude that Plaintiff's expectation of progressive discipline was objectively reasonable and that she therefore created a genuine issue of material fact regarding an implied employment contract between herself and Greyhound. We determine that there is sufficient evidence that a jury could reach such a conclusion—not that it must come to such a conclusion—and that the fact-finder must determine whether an implied contract exists.

## III.    Retaliatory Discharge Claim

{32}    We review Plaintiff's summary judgment argument regarding her retaliatory discharge claim under the same standard of review as articulated above. *See Juneau*, 2006-NMSC-002, ¶ 8; *BPLW Architects & Eng'rs, Inc.*, 2009-NMCA-081, ¶ 7; *Romero*, 2010-NMSC-035, ¶ 10.

{33}    "The tort of retaliatory discharge was first recognized in New Mexico . . . as an exception to the traditional rule that an employee at will may be discharged without cause." *Gandy v. Wal-Mart Stores, Inc.*, 1994-NMSC-040, ¶ 3, 117 N.M. 441, 872 P.2d 859. To recover damages based on retaliatory discharge, a plaintiff "must demonstrate that [they were] discharged because [they] performed an act that public policy has authorized or would encourage, or because [they] refused to do something required of [them] by [their] employer that public policy would

condemn." *Shovelin v. Cent. N.M. Elec. Coop.*, 1993-NMSC-015, ¶ 24, 115 N.M. 293, 850 P.2d 996 (internal quotation marks and citation omitted). The parties initially disagree whether the policy at issue—telling the truth or refusing to commit perjury—is one protected by the tort of retaliatory discharge. They also disagree whether Plaintiff has established a genuine issue of material fact regarding whether Plaintiff was terminated based on this breach of public policy.

{34}    We conclude that even if telling the truth or refusing to perjure oneself is a public policy that supports the tort of retaliatory discharge,[4] *see id.* ¶ 30 (citing with approval a California appellate decision wherein the court "recognized that the state's perjury statute reflected a public policy encouraging truthful testimony to ensure the proper administration of justice"); NMSA 1978, § 30-25-1 (2009) (New Mexico's perjury statute), Plaintiff has failed to establish a genuine issue of material fact regarding whether she was terminated for that reason. We again start with Greyhound's prima facie case.

---

[4]Plaintiff also argues the retaliation was based on the fact that she filed a restraining order on a former Greyhound employee. Plaintiff cites *Shovelin*, 1993-NMSC-015, ¶ 25, for her sole argument regarding public policy on this front, which, in Plaintiff's view, supports the notion that "[s]eeking a protective order would likely meet the threshold as a protected activity under New Mexico case law." We decline to address this issue because Plaintiff has not developed her argument. *See Lee v. Lee (In re Adoption of Doe)*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 (explaining that where arguments are not supported by cited authority, we presume counsel was unable to find supporting authority, will not research authority for counsel, and will not review issues unsupported by authority).

{35}    The parties agree that Plaintiff was called to testify in a federal criminal case regarding Greyhound's failure to preserve surveillance security video. In the federal case, the district court noted that federal public defenders sent a preservation request for surveillance footage to Plaintiff as the manager of the terminal, the out-of-state associate general counsel for Greyhound, and to Greyhound's local counsel. *See United States v. Ramos-Burciaga*, No. 1:17-cr-002236 WJ, 2018 WL 1997290, at *1 (D.N.M. Apr. 26, 2018) (mem. & order). Later, the federal district court granted a subpoena for the video, and Greyhound responded that the local station manager— Plaintiff—had not preserved the video because she mistakenly believed she only had to preserve video when she received a subpoena and that she did not have to preserve evidence based merely upon a preservation request. *Id.*

{36}    In addressing Plaintiff's failure to preserve the footage, the federal district court noted that earlier that year Greyhound held a meeting with Plaintiff, a DEA agent, and David Streiff, who was a Greyhound security operations manager, "to discuss the parameters in which law enforcement [could] operate in the Albuquerque Greyhound Terminal." *Id.* at *2. During that meeting, Greyhound reiterated that they needed a subpoena for requests for video surveillance from the DEA, but they did not discuss preservation requests submitted by defense counsel. *Id.* After the meeting, Plaintiff asked Streiff how she should respond to preservation requests and subpoenas for video footage. *Id.* Streiff told her that she did not "need to act on hand-

delivered 'legal documents' until attorneys from Greyhound's corporate office advised her." *Id.* Plaintiff admitted she was mistaken about the effect of this conversation and "thought that she did not need to respond to preservation requests until instructed to do so by Greyhound's legal department," and she thought a preservation request was optional. *Id.* The federal district court noted that it found Plaintiff's explanation credible. *Id.* This case suggests that in 2017, Plaintiff's testimony was that she was confused about her instructions regarding preserving surveillance video.

{37} Next, Greyhound presented an affidavit from David Leach, the CEO of Greyhound when Plaintiff was employed there. Leach explained that in an April 2018 meeting, he learned of numerous errors made by Plaintiff relating to the video surveillance, Plaintiff was the sole person with access to the office where the videos were stored and reviewed, and Plaintiff alone downloaded the videos. Later, he learned that Plaintiff advised Greyhound's defense counsel that other individuals had access to the videos and the ability to download the videos. He also noted Plaintiff's testimony in the federal matter in which she admitted to failing to timely respond to subpoenas and preserve video surveillance. Leach affirmed that Plaintiff was terminated because of what he learned at the April 2018 meeting, Plaintiff's admissions during the federal criminal case, "and understanding the financial impact of [Plaintiff]'s lack of oversight and responsiveness."

{38} As such, Greyhound made a prima facie case that Plaintiff was terminated because of her failure to preserve the surveillance video when presented with preservation letters. Plaintiff now carries the burden of demonstrating that a genuine issue of material fact exists regarding whether her refusal to perjure herself was a motivating factor in her termination. *See Romero*, 2010-NMSC-035, ¶ 10 (concluding that "[o]nce [a] prima facie showing has been made, the burden shifts to the non[]movant to demonstrate the existence of" a genuine issue of material fact (internal quotation marks and citation omitted)).

{39} Plaintiff presents evidence that in totality demonstrates that Greyhound had issues with surveillance footage before and after Plaintiff was terminated and that there were internal conflicts regarding the requirements for preservation of evidence. This evidence includes internal emails, a lack of formal or informal policy regarding legal requests for footage, and an affidavit from the employee who replaced Plaintiff explaining that the video issues remained well after Plaintiff no longer worked for Greyhound. Though this evidence demonstrates there was a problem with handling the videos and responding to preservation requests that was bigger than Plaintiff's own performance, it does not bear on whether she was fired for telling the truth or failing to perjure herself because it does not support an inference that Greyhound expected her to lie or not tell the truth. This also applies to Plaintiff's argument that

circumstantial evidence includes her previous positive performance reviews and that she never received any documentation regarding the reason for her termination.

{40} The only other evidence Plaintiff references is that she was terminated less than a month after she testified and that when she was fired her supervisor told her it was because she made Greyhound "look bad." We acknowledge that "[t]emporal proximity between protected conduct and adverse employment action is one factor that may support an inference of retaliatory motive." *Velasquez v. Regents of N. N.M. Coll.*, 2021-NMCA-007, ¶ 41, 484 P.3d 970 (considering, among other factors, a gap of "just a few weeks" to uphold a jury verdict for a plaintiff on the question of retaliatory motive). However, when we take this evidence surrounding Plaintiff's termination in context with Plaintiff's federal testimony that she *misunderstood* her supervisor's directive regarding the surveillance footage, and that she did not attempt to obfuscate the facts by failing to produce material evidence as instructed, it is not reasonable to infer that she was fired because she lied or that she refused to perjure herself, as she alleges. The evidence establishes that her failure to preserve evidence was bad for Greyhound's business and she was terminated for that reason. As such, Plaintiff has failed to demonstrate a genuine issue of material fact regarding whether she was fired for telling the truth or failing to perjure herself.

**CONCLUSION**

{41}    We reverse the district court's decision to dismiss Plaintiff's claims against BTB under Rule 1-012(B)(6) and its grant of summary judgment to Greyhound on Plaintiff's claim regarding the existence of an implied contract incorporating progressive discipline prior to termination. We otherwise affirm.

{42}    **IT IS SO ORDERED.**


_____
                                        **J. MILES HANISEE, Judge**

**I CONCUR**


_____
**GERALD E. BACA, Judge**


**ZACHARY A. IVES, Judge (concurring in part and dissenting in part)**

**IVES, Judge (concurring in part and dissenting in part).**

{43}     I concur in the parts of the Court's opinion addressing Plaintiff's claims against Greyhound. I agree that Greyhound was not entitled to summary judgment on Plaintiff's claim for breach of implied contract and that Greyhound was entitled to summary judgment on Plaintiff's claim for retaliatory discharge.

{44}     However, I must part ways with my esteemed colleagues on the subject of qualified immunity. As I will explain, I do not believe the Court has provided a rationale that supports its categorical rejection of qualified immunity for lawyers. Maybe such a rationale exists, but if so, I do not see it in the Court's opinion. And without it, the Court should not reverse the district court's ruling, which is presumptively correct. *See Corona v. Corona*, 2014-NMCA-071, ¶ 26, 329 P.3d 701.

{45}     The district court answered a legal question of first impression in New Mexico when it concluded that qualified immunity extends to lawyers acting as agents of their clients under certain circumstances. As an appellate court, we must begin with the presumption that the district court was correct, and we may reverse only if the district court is wrong. *Id.* But I do not believe the Court's opinion establishes that the district court *is* wrong. The Court only points out reasons why the district court *might* be wrong, but that is not enough to rebut the presumption of correctness and conclude that reversible error occurred.

{46} The Court begins by brushing aside the general rule recognized in *Marchman*, 1995-NMSC-041, ¶¶ 55-56, that lawyers are agents of their clients. *Maj. op.* ¶ 17. The Court does so by implying that although principles of agency law apply in the context of litigation sanctions, those principles might not apply in the context of qualified immunity. Fair enough as a place to start the analysis, but the Court stops there. The Court does not go on to reach the conclusion that agency law principles are inapplicable here. By merely raising a question about whether the district court erred by relying on agency principles, the Court provides no basis for concluding that the district court did err by doing so.

{47} The Court next tries to distinguish *Ettenson* and *Deflon* by asserting "that the agency relationship between attorneys and their clients is not the equivalent of, even if it is akin to, the relationship of an employee officer to his or her corporation." *Maj. op.* ¶ 15. This begs the key question: Are the distinctions perceived by the Court pertinent to the legal question presented or are they just distinctions that make no difference? The Court does not supply an answer, and without establishing that a legally significant distinction exists, I see no basis for concluding that the district court erred by treating the two agency relationships similarly.

{48} I also see no basis in the Court's opinion for concluding that the district court erred by relying on cases from other jurisdictions holding that some form of qualified immunity applies to lawyers acting as agents for their clients. *See maj. op.* ¶ 16 &

n.2. The Court declines to give those cases any persuasive weight, but the Court does not criticize their holdings or legal analyses in any way. The Court does not contend that the cases are poorly reasoned or that they are incompatible with New Mexico law. Because the Court has not rejected the out-of-jurisdiction cases for substantive reasons, I do not believe that the Court has established that the district court erred by relying on those cases.

{49} The Court addresses the cases by asserting that the lack of uniformity in qualified immunity doctrines in other jurisdictions "does not well lend itself to the creation of such protection in New Mexico." *Maj. op*. ¶ 16. It is not clear to me what this assertion means. I see two possible meanings, neither of which establishes error.

{50} The Court might intend to assert that lack of uniformity in other jurisdictions is, as a general matter, inherently problematic whenever a New Mexico court is presented with a question of first impression. I see this from the opposite perspective. In my view, if New Mexico's appellate and trial courts followed that approach, we would rarely be able to recognize legal doctrines that have already been recognized in multiple jurisdictions—even doctrines that are based on sound reasoning and compatible with New Mexico law—because perfect uniformity across jurisdictions is rare. Requiring uniformity would hinder the development of the law in our state. I think variety among other jurisdictions is actually helpful to our courts when we must answer questions of first impression in New Mexico. When variety exists

elsewhere, we have an opportunity to learn from the ideas and experiences of courts in other jurisdictions. In this case, for example, the different doctrines are options to consider when determining whether qualified immunity for lawyers—of a variety that exists somewhere else or a unique variety—should be adopted in New Mexico.

{51}    The other possible meaning of the Court's assertion is that grappling with the lack of uniformity is a demanding task.[5] Maybe, but even if it is, that does not establish that the district court erred by completing that task and concluding that the out-of-jurisdiction cases support the extension of immunity doctrine to lawyers in New Mexico. As I see it, the only way to establish that the district court did, in fact, err by relying on those cases is to analyze the cases and conclude that they are not well reasoned or that they are inconsistent with the law of our state.

{52}    The final points made by the Court also do not establish that the district court erred, and I think they leave a misimpression about the impact of the Court's opinion

---

[5]The Court mentions that the parties have not grappled with the variety in their briefs. *Maj. op.* ¶ 16. To the extent that this is a problem, we have tools to fix it: supplemental briefing and oral argument. *See* Rule 12-318(D)(1) NMRA; Rule 12-319(A) NMRA. I see these tools as indispensable when, as in this case, an appellate court wishes to issue a precedential opinion but also concludes that the arguments in the parties' briefs do not adequately address a significant point. *See Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 ("To rule on an inadequately briefed issue, this Court would have to develop the arguments itself, effectively performing the parties' work for them. . . This creates a strain on judicial resources and a substantial risk of error. It is of no benefit either to the parties or to future litigants for this Court to promulgate case law based on our own speculation rather than the parties' carefully considered arguments." (citation omitted)).

in this case. The Court starts by accurately observing that "agency derived lawyer immunity is an area in which our Supreme Court has not spoken." *Maj. op.* ¶ 18. In other words, the law on qualified immunity for lawyers has not been settled—one way or the other—by our Supreme Court. Because this doctrine has been neither accepted nor rejected by our Supreme Court, the district court was free to accept or reject it, just as this Court was. *See State v. Mares*, 2024-NMSC-002, ¶ 41, 543 P.3d 1198 (recognizing that if our Supreme Court "ha[s] not directly ruled on an issue in a manner that would be dispositive in the case at bar, the Court of Appeals is free to conduct its own analysis of the issue"). The question was an open one. But the Court states that it had already been answered: "Our holding today is consistent with the circumstance that has been heretofore in place in New Mexico jurisprudence; that is, despite serving as agents to clients, lawyers are not immune from suit even in instances in which they act in good faith and in the best interest of their clients." *Maj. op.* ¶ 18. This statement would only be accurate if New Mexico already had precedent rejecting lawyer qualified immunity. *See Mares*, 2024-NMSC-002, ¶ 41 ("A precedential case is directly controlling if it compels the outcome of the issue in the current case; that is, if the precedential case answers the definitive question in the case at bar." (alterations, internal quotation marks, and citation omitted)). The Court conflates the existence of precedent rejecting lawyer qualified immunity with the absence of precedent on the question of lawyer qualified immunity. What we had

until today was the latter, not the former. Because no controlling precedent existed until the Court issued its opinion in this case, I disagree with my esteemed colleagues that the Court has merely maintained our state's established jurisprudence.[6]

{53}     Instead, the Court has created new jurisprudence by answering a question of first impression, and I do not believe the Court has provided a rationale that justifies rejecting the district court's presumptively correct answer to that question. *See Corona*, 2014-NMCA-071, ¶ 26. I therefore respectfully dissent from the part of the Court's opinion addressing qualified immunity.

_____
**ZACHARY A. IVES, Judge**

---

[6]The Court's opinion could be read to imply that the Court is uncomfortable holding that agency immunity doctrine applies to lawyers because the Court wishes to defer to our Supreme Court. But if the Court is uncomfortable holding that the doctrine does apply, it should be equally uncomfortable holding that the doctrine does not apply. Either holding makes new law. And if new law on the question should be made by our Supreme Court—rather than this Court—we should not issue a precedential opinion that either adopts or rejects the doctrine; we should certify the question to our Supreme Court. *See* NMSA 1978, § 34-5-14(C)(2) (1972) (allowing certification of questions of substantial public interest that should be decided by our Supreme Court).